669 F.2d 142
 2 Ed. Law Rep. 643
 Dr. Joseph T. SKEHAN, Appellant,
v.
BOARD OF TRUSTEES OF BLOOMSBURG STATE COLLEGE and Dr. Robert
Nossen and Dr. Charles Carlson and John Pittenger,
Superintendent of Education,
Commonwealth of Pennsylvania
and Bloomsburg State College.
 Nos. 81-1094, 81-1299.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 29, 1981.
Decided Jan. 26, 1982.
 
 Susan J. Forney (argued), Allen C. Warshaw, Deputy Attys. Gen., Chief, Civil Litigation, Leroy S. Zimmerman, Atty. Gen., Harrisburg, Pa., for appellees.
 Cletus P. Lyman (argued), Lyman & Ash, Philadelphia, Pa., for appellant.
 Before ADAMS, ROSENN and SLOVITER, Circuit Judges.OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 FACTUAL BACKGROUND
 
 1
 Before us is another phase of litigation which began over nine years ago arising out of the decision of Bloomsburg State College (College) not to renew the contract of one of its faculty members, Dr. Joseph T. Skehan, and subsequently to dismiss him from the College faculty in mid-term of his final contract year. Skehan's suit has been the subject of three previous opinions of this court, a decision by the Supreme Court, and several district court opinions, some reported and some unreported.[1] Skehan here appeals from two orders of the district court dealing with his remedy: (1) the order denying, on the ground of the Eleventh Amendment, his motion for an award of special damages in the form of back pay, and (2) the order denying his motion to require the College to provide him with the type of pretermination hearing which he contends was required. We will not detail the lengthy history of this litigation, and instead focus only on the facts essential to the disposition of this appeal.
 
 
 2
 Skehan was appointed as a non-tenured Associate Professor of Economics at the College in January, 1969 under a six-month trial contract, which was renewed for the 1969-70 academic year. In May, 1970 Skehan was notified by letter from then college president, Robert Nossen, that his contract would be renewed for the 1970-71 academic year, but would not be renewed beyond that year. We will refer to this decision throughout as the nonrenewal decision. Skehan, who accepted the offer of employment for the 1970-71 academic year, protested that the nonrenewal decision had been caused by considerations violative of his academic freedom and claimed that he was therefore entitled to a hearing pursuant to Article 5e of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College (hereinafter Article 5e). The College rejected Skehan's request for an Article 5e hearing on the reasons for the nonrenewal decision.
 
 
 3
 In the fall of 1970, during Skehan's terminal contract year, he became involved in a dispute between the economics department and the College's administration concerning the scheduling of classes. In October, he was first suspended and then dismissed on the ground of his failure, despite repeated warnings, to teach his classes as scheduled by the College. We will refer to this mid-term termination decision as the dismissal decision.
 
 
 4
 Skehan filed suit in federal court alleging that both his contract nonrenewal and his dismissal violated his First Amendment rights because they were in retaliation for his role in campus political issues and violated his Fourteenth Amendment right to due process because defendants failed to comply with the laws and regulations of the College. Ultimately, his First Amendment claim was rejected and it is not before us. He was more successful on his claim of procedural violations. The district court found that Skehan's one year employment contract was a property interest within the meaning of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and that Skehan's dismissal violated due process because it was accomplished before he was given a hearing at which he had the opportunity to justify his actions or present reasons why dismissal was not the appropriate sanction. Skehan v. Board of Trustees of Bloomsburg State College, 358 F.Supp. 430 (M.D.Pa.1973). In a subsequent decision, following remand to the district court which conducted a hearing on the issue, that court concluded that Skehan also possessed a contractual right to a hearing as provided in Article 5e (which incorporates the procedures specified in Article 9) on the College's nonrenewal decision, that he had invoked that right within a reasonable time, and that the College's failure to afford him those procedures violated the due process clause of the Fourteenth Amendment. Skehan v. Board of Trustees of Bloomsburg State College, 431 F.Supp. 1379, 1391 (M.D.Pa.1977).
 
 
 5
 Thereafter, the district court held hearings on the appropriate remedy. In an opinion filed July 20, 1977, the court declined to order full and immediate reinstatement, but concluded that the proper remedy for the College's failure to provide Skehan with the necessary hearings was his reinstatement, without teaching duties, to the suspended status he held on October 15, 1970, after he was suspended for refusing to teach his classes but before he was formally terminated and removed from the payroll pending administrative hearings to determine whether nonrenewal and dismissal were proper. Skehan v. Board of Trustees of Bloomsburg State College, 436 F.Supp. 657, 664 (M.D.Pa.1977). The district court held that the College would be required to afford Skehan a hearing in accordance with the contractual Article 5e procedures on his nonrenewal and a hearing comporting with due process on his dismissal, in that order. Id. at 664, 668-69.
 
 
 6
 Following the district court's order, Skehan was reinstated as a faculty member, and received approximately $22,000 in salary from August 1, 1977 through June 2, 1978. He also negotiated with the College and received $51,500 for attorney's fees and expenses. Appellant's brief at 3. A hearing on Skehan's nonrenewal was conducted before the Committee on Professional Affairs, an elected committee of faculty members which was the body designated in Article 5e and which was ordered recreated because the Policy Statement of which that article was a part was no longer in effect, having been superceded by a collective bargaining agreement. That Committee found his contract was not renewed for reasons violative of academic freedom and recommended his reinstatement and reconsideration. Thereupon, the College's president, James H. McCormick, decided to withdraw the nonrenewal letter, and to rely instead on the dismissal action. The College conducted the dismissal proceedings which are at issue on this appeal. The majority of the Committee which heard those proceedings recommended Skehan's termination, and on June 2, 1978, the College's president notified Skehan in writing that he accepted the Committee's findings of fact and recommendation, and that Skehan was terminated from employment at the College and removed from the payroll effective as of the end of that day.
 
 II.
 THE COLLEGE'S IMMUNITY
 
 7
 Skehan has throughout this litigation, beginning with the filing of his complaint, contended that he was entitled, inter alia, to reinstatement and an award of back pay. In our first consideration of this issue, we held that "if under Pennsylvania law the College is an agent of the Commonwealth, state sovereign immunity would preclude the award of any relief against it directly and any but prospective monetary relief, equitable or legal, in an order directed against the individual defendants." Skehan v. Board of Trustees of Bloomsburg State College, 501 F.2d 31, 42 (3d Cir. 1974). The Supreme Court granted Skehan's petition for a writ of certiorari and, in a summary disposition, remanded the case to us for further consideration in light of, inter alia, Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Skehan v. Board of Trustees of Bloomsburg State College, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975).[2] We thereupon reviewed the case en banc, and held that in light of Wood v. Strickland our prior assumption of an unqualified common law immunity for the individual defendants was erroneous. Skehan v. Board of Trustees of Bloomsburg State College, 538 F.2d 53, 60 (3d Cir.) (en banc), cert. denied, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976). We remanded to the district court so that it could determine whether the individual defendants acted without malice and whether they knew or reasonably should have known that the actions taken would violate Skehan's constitutional rights. In addition, we reexamined the issue of the College's immunity in light of the decision in Brungard v. Hartman, 12 Pa.Commw. 477, 315 A.2d 913 (1974), which had not been called to our attention before our prior opinion was filed. We concluded that the holding of Brungard that state colleges such as Bloomsburg State College are agencies for which Pennsylvania claims sovereign immunity was dispositive of the back pay issue, and therefore held that a back pay award could not be made out of the College's treasury.
 
 
 8
 On remand, the district court found that the one individual defendant whose conduct was at issue, President Nossen, acted in good faith and without malice, and was entitled to the qualified immunity recognized in Wood v. Strickland, supra. 431 F.Supp. 1379 (M.D.Pa.1977). The district court also declined to entertain Skehan's argument that this court had erred in holding that an award of damages in the form of back pay against the College was barred by the Eleventh Amendment. 436 F.Supp. 657, 665 (M.D.Pa.1977). On appeal, Skehan relied on the intervening decision of the Pennsylvania Supreme Court in Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A.2d 709 (1978), which abrogated the judicially-created doctrine of sovereign immunity in suits against the Commonwealth for torts of its agents. We rejected Skehan's claim on the ground that the passage of Act No. 152[3] by the Pennsylvania legislature "reaffirming and preserving sovereign immunity as a bar to claims brought against the Commonwealth and its agencies, officials, and employees," had "effectively overruled the decision of the Pennsylvania Supreme Court in Mayle" and therefore we had no need to interpret the effect of the Mayle court's abrogation of Pennsylvania's state law sovereign immunity on that state's Eleventh Amendment immunity from damage actions in federal court. Skehan v. Board of Trustees of Bloomsburg State College, 590 F.2d 470, 487-88 (3d Cir. 1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979). We thus declined to disturb our previous ruling that the Eleventh Amendment precluded an award of back pay against the College. Id. at 488.[4]
 
 
 9
 When the case was again before the district court, Skehan filed a motion for an award of special damages in the form of back pay for the period, inter alia, from October 17, 1970 through July 31, 1977, on the ground of an intervening change in Pennsylvania law. The district court's denial of this motion on November 24, 1980 raises one of the two issues on appeal.
 
 
 10
 Skehan contends that the recent decision of the Pennsylvania Supreme Court in Gibson v. Commonwealth of Pennsylvania, 490 Pa. 156, 415 A.2d 80 (1980), requires us to reconsider our previous holding that Act No. 152 overrules Mayle. In Gibson the court held that Act No. 152 could not be applied retroactively to extinguish causes of action which became actionable prior to the effective date of the Act. In reaching this conclusion, the court relied upon state and federal decisions which hold that a legislature may not constitutionally eliminate a remedy which has already accrued. Id. at 161-62; 415 A.2d at 83. The court further reasoned that although tort claims against the Commonwealth were not actionable prior to Mayle, the abrogation of sovereign immunity in Mayle retroactively applied to claims which arose prior to the Mayle decision. Id. at 162-63; 415 A.2d at 84. Shortly thereafter, in Brungard v. Mansfield State College, 491 Pa. 114, 419 A.2d 1171 (1980), the Pennsylvania Supreme Court applied the rule of Gibson, and held that a negligence action against a state college which had been filed in 1972 should not have been dismissed by the lower court on the ground that Act No. 152 barred the action.
 
 
 11
 Skehan's action accrued and was in existence prior to the passage of Act No. 152 on September 28, 1978. Therefore, under the Gibson decision, the Act cannot be retroactively applied, as we previously assumed. Because "an appellate court must apply the law in effect at the time it renders its decision," Bradley v. School Board of the City of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (citations omitted), we must reconsider our earlier holding that the Eleventh Amendment bars the award sought by Skehan.
 
 
 12
 The Eleventh Amendment provides, in relevant part: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State...." It applies only to bar suit against a state in federal court. Whether a state may be sued in its own state courts is a matter of its own state law. Skehan notes that in Hans v. Louisiana, 134 U.S. 1, 17, 10 S.Ct. 504, 508, 33 L.Ed. 842 (1890), the Supreme Court construed the Eleventh Amendment to permit a state to be sued in federal court by its own consent. Skehan argues that although the Pennsylvania Supreme Court in Mayle did not expressly address the applicability of its holding to Pennsylvania's Eleventh Amendment immunity, the decision should nevertheless be construed to waive the College's immunity because the court's language in Mayle rejects the sovereign immunity doctrine and its justifications in sweeping and unequivocal language, and thus implicitly abrogates sovereign immunity in federal as well as state court.
 
 
 13
 The issue now before us has been addressed by a number of the district courts in this circuit which have been almost unanimous in their conclusion that Mayle does not constitute consent by the Commonwealth and its agencies to be sued in federal court. Moore v. Colautti, 483 F.Supp. 357, 374 n.26 (E.D.Pa.1979), aff'd without opinion, 633 F.2d 210 (3d Cir. 1980); Savory v. Kawasaki Motor Corp., 472 F.Supp. 1216, 1217-18 (E.D.Pa.1979); Skrbina v. Pennsylvania Department of Highways, 468 F.Supp. 215 (W.D.Pa.1979); Ruman v. Commonwealth of Pennsylvania, 462 F.Supp. 1355, 1360-61 (M.D.Pa.), aff'd without opinion, 612 F.2d 574 (3d Cir. 1979), cert. denied, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 823 (1979); Hernandez v. Whitesell, 462 F.Supp. 569, 573-74 (E.D.Pa.1978). Contra Greenfield v. Vesella, 457 F.Supp. 316, 319-20 (W.D.Pa.1978). For the reasons discussed below, we agree with the conclusion of these courts.
 
 
 14
 The cases which have considered a state's waiver of its Eleventh Amendment immunity have generally concerned the following issues: First, whether a particular legislative enactment permitting suits against a state in its courts serves as a consent to comparable suits in federal court. See, e.g., Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946) (Utah statute giving consent to certain taxpayers' suits not applicable to suits in federal court). Second, whether certain actions by the state, such as participation in federal aid programs, constitute consent to suit in federal court. See, e.g., Edelman v. Jordan, 415 U.S. 651, 671-74, 94 S.Ct. 1347, 1359-61, 39 L.Ed.2d 662 (1974) (no waiver by mere participation in federal welfare programs); Daye v. Commonwealth of Pennsylvania, 483 F.2d 294, 298 (3d Cir. 1973), cert. denied, 416 U.S. 946, 94 S.Ct. 1956, 40 L.Ed.2d 298 (1974) (no waiver based on mere acceptance of funds by the Commonwealth under the Federal-Aid Highway Act). See also Parden v. Terminal Ry., 377 U.S. 184, 192-93, 84 S.Ct. 1207, 1212-13, 12 L.Ed.2d 233 (1964) (where congressional statute authorized suit in federal court against any railroad operating in interstate commerce, state's operation of railroad in interstate commerce constituted consent to suit in federal court); Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959) (waiver of immunity found in states' entering into interstate compact approved by Congress). Third, whether Eleventh Amendment immunity has been waived by a general or voluntary appearance in federal court by an officer of the state, such as the attorney general. See, e.g., Clark v. Barnard, 108 U.S. 436, 447-48, 2 S.Ct. 878, 882-83, 27 L.Ed. 780 (1883) (waiver found based on voluntary appearance by the state in litigation in federal court). But see Richins v. Industrial Construction, Inc., 502 F.2d 1051, 1056 (10th Cir. 1974) (no waiver by litigating on the merits in light of state statute precluding suits against state in federal court).
 
 
 15
 Neither party has directed us to any case in which the issue of waiver of Eleventh Amendment immunity by judicial decision alone has arisen. While we are aware of no case law authority indicating that the judiciary is without authority in this regard, we agree with appellees that strong policy considerations support a conclusion that the question of waiver of Eleventh Amendment immunity would ordinarily be a decision for the legislature or executive rather than for the judiciary. The legislative and executive branches have the information needed to evaluate the ability of the state treasury to bear the potential monetary burden that may result from consent to suit in federal court. Indeed, the sequence of events which followed the Mayle decision, enactment of an attempted legislative override followed by a partial nullification by the Pennsylvania Supreme Court, demonstrate the differing positions of the various Pennsylvania governmental branches on waiver of immunity.
 
 
 16
 More significantly, even if judicial waiver of Eleventh Amendment immunity were appropriate, we do not believe that the Mayle decision constitutes a waiver of such immunity. The Supreme Court has held that "(i)n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.' " Edelman v. Jordan, 415 U.S. at 673, 94 S.Ct. at 1361 (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Similarly, in Daye v. Commonwealth of Pennsylvania, 483 F.2d at 298, we also stated that "the conclusion by a court that there has been a waiver will not be lightly inferred" and that "when a waiver does take place it must be clear and unequivocal." This rule of clear and express waiver has been consistently applied in cases in which a state has consented to suit in its own courts by statute; absent a clear declaration of a state's consent to a similar suit against itself in federal court, such consent has not been inferred. See Kennecott Copper Corp. v. State Tax Commission, 327 U.S. at 577, 66 S.Ct. at 747; Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 465, 65 S.Ct. 347, 351, 89 L.Ed. 389 (1945); Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 54-55, 64 S.Ct. 873, 876-77, 88 L.Ed. 1121 (1944). The situation here is analogous.
 
 
 17
 The opinion of the Pennsylvania Supreme Court in Mayle does not, by even the most liberal standards, constitute a clear and unequivocal waiver of Eleventh Amendment immunity. The precise question before the court in Mayle was whether Pennsylvania could be sued in state court for injuries suffered by the plaintiff as a result of a negligently maintained public highway. See 479 Pa. at 386, 388 A.2d at 709. In reversing the lower court's dismissal of appellant's complaint based on the sovereign immunity doctrine, the Pennsylvania court expressly "abrogated" that doctrine, reasoning that since sovereign immunity in Pennsylvania was a non-constitutional doctrine[5] that was established by judicial decisions, the state constitution did not preclude it from abolishing this judicially-created doctrine. The court further reasoned that none of the historical arguments favoring retention of the doctrine have continuing validity. Except to note that the Pennsylvania legislature had refused to ratify the Eleventh Amendment when it was proposed by Congress, the Mayle opinion does not discuss, either expressly or impliedly, the question of waiver of Pennsylvania's federal constitutionally-based immunity from suit in federal court. Rather, the opinion focuses on the judicially-created common law doctrine of sovereign immunity.
 
 
 18
 In light of the requirement applicable in this case that states[6] must clearly and expressly waive their Eleventh Amendment immunity to suit in federal court, we cannot infer that the Mayle court's waiver of Pennsylvania's immunity under state law constitutes a waiver of its Eleventh Amendment immunity. We, therefore, adhere to our earlier holding that an award of special damages against the College is barred by the Eleventh Amendment and affirm the lower court's denial of Skehan's motion for an award of special damages.[7]
 
 III.
 ADEQUACY OF HEARING PROCEDURE
 
 19
 In the same letter dated December 15, 1977 in which President McCormick notified Skehan that the College was no longer proceeding with its nonrenewal action, he also informed Skehan that the College would proceed to the required hearing on Skehan's dismissal. By letter dated January 5, 1978 from Assistant Attorney General C. Glendon Frank, who was acting as counsel to President McCormick, Skehan was notified that this hearing would take place on January 14, 1978 before "a committee composed of one representative chosen by the President and the four highest vote-getting members of the Committee on Professional Affairs who can be available on that date and time." App. at 600a. The letter enclosed a Statement of Charges against Skehan, prepared by Deputy Attorney General Howard Levinson who presented the charges against Skehan at the hearing, and stated that "The administration takes no position on the truth or falsity of these charges." In this regard, the letter stated, "As counsel to the President, I view his position as one of a decision maker, not a prosecutor in this instance." The letter further stated that each side would have the right to present witnesses at the hearing who would be subject to cross-examination by opposing counsel and that "the hearing committee (would) make findings of fact as to the truth or falsity of the Statement of Charges, and make a recommendation thereon to the President." Skehan objected to the procedure and notified the members of the entire Committee on Professional Affairs that neither he nor any representative on his behalf would attend. The hearing committee was thereafter reconstituted to the full nine-member Committee on Professional Affairs and held its first meeting at the time scheduled.
 
 
 20
 Skehan was subsequently notified of the committee's intention to hold additional meetings on January 27, February 10, February 17 and February 18, but he did not appear at any of the meetings except to appear at the meeting on January 27th to make an objection to the "jurisdiction" of the Committee on Professional Affairs. Skehan subsequently received a copy of the final report of the hearing committee dated April 10, 1978 which made findings of fact and recommended that Skehan's contract be terminated. A two-member minority report recommended against termination. By letter dated May 11, 1978 from Assistant Attorney General Frank, Skehan's attorney was granted the opportunity to file a post-hearing brief and was invited to attend and present his views at the meeting of the Board of Trustees on May 17, 1978, at which the Board would consider its recommendation to the President on whether Skehan should be dismissed.
 
 
 21
 On June 2, 1978, President McCormick informed Skehan that based on the recommendations of the hearing committee and the Board, he was being terminated and removed from the College payroll, effective that day. Skehan then filed a motion with the district court to enforce paragraphs 11 and 12 of that court's judgment of July 20, 1977. Skehan contended the hearings were not timely, failed to comply with the requirements of the district court's order of July 20, 1977, and did not comport with due process. Each of these contentions was rejected by the district court.
 
 
 22
 Skehan contends that he had a right to have the dismissal procedure comport with the procedures set forth in article 9 of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg College, and he also appears to contend that the district court specifically so provided in its judgment of July 20, 1977. Turning to the latter contention first, we note that in its July 20, 1977 opinion the district court stated:
 
 
 23
 Skehan's reinstatement to a suspended status may be ended either by his full reinstatement or a termination. The College will be required to afford him a hearing comporting with due process at which he will have an opportunity to refute any charges relating to his conduct in 1970.
 
 
 24
 436 F.Supp. at 664.[8] Looking to the plain language of the district court's order, we agree with its interpretation that the order did not require defendants to provide Skehan with any particular sort of hearing, other than one which "comported with the due process clause of the Fourteenth Amendment."
 
 
 25
 We also reject Skehan's contention that he had a contractual right to the procedures set forth in Article 9 upon dismissal for cause.[9] As this court has previously recognized, Article 9 by its terms prescribed the procedures to be afforded tenured faculty members upon dismissal for cause. See 590 F.2d at 473 n.1. It is conceded that Dr. Skehan was a non-tenured faculty member. The Article 9 procedures also applied to nonrenewal decisions when the faculty member alleged "that a decision not to reappoint him has been caused by considerations violative of academic freedom." It was this language which was applied to support the holding that Skehan was entitled to the Article 9 procedure on his nonrenewal decision. See 431 F.Supp. at 1388. There is no comparable language applying those procedures to for cause dismissals of non-tenured faculty. While we may agree with Skehan that the failure to so provide was illogical, we cannot read into the Statement language that does not appear in that detailed document.[10]
 
 
 26
 Although Skehan contends that various policy statements of the American Association of University Professors should be read into the College's written policy, even under the most liberal interpretation we could conclude only that the reference in the College's Faculty Handbook for 1970-71 to the 1940 Statement of Principles on Academic Freedom and Tenure of the American Association of University Professors[11] constituted an adoption of the 1940 Statement. The specific procedures which Skehan argues were not applied in his case are not derived from the 1940 Statement, but from subsequent additions and revisions which were not specifically referred to in the College's Faculty Handbook. Therefore, even if we were to agree with Skehan that the College had adopted the 1940 Statement, there is no basis on this record to find that the College also intended to adopt those additional statements upon which Skehan relies. Moreover, as discussed infra, the record establishes that the procedures afforded Skehan in connection with his dismissal hearing substantially complied with the 1940 Statement.
 
 
 27
 Thus, we conclude that the College was not required to afford Skehan the precise procedures set out in Article 9. We must still determine whether there is any validity to his claim that the procedures he was afforded did not comport with the minimal constitutional requirements of due process. We are guided in our inquiry by the standards established in Chung v. Park, 514 F.2d 382 (3d Cir.), cert. denied, 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), where we reviewed the procedures afforded a college faculty member upon the college's decision not to renew his contract. In holding that the procedures afforded the plaintiff in Chung satisfied the requirements of due process, we emphasized that "(i)f the procedure used by the college is adequate to prevent unreasonable, arbitrary or capricious termination decisions, it satisfies due process." Id. at 387. We further noted that "in pretermination hearings ... the person being deprived of his 'property interest' is entitled to minimum procedural safeguards which are adapted to the particular characteristics of the interests involved and the limited nature of the controversy." Id. at 386. The safeguards enumerated in that decision were:
 
 
 28
 (1) written notice of the grounds for termination; (2) disclosure of the evidence supporting termination; (3) the right to confront and cross-examine adverse witnesses; (4) an opportunity to be heard in person and to present witnesses and documentary evidence; (5) a neutral and detached hearing body; and (6) a written statement by the fact finders as to the evidence relied upon.
 
 
 29
 Id.
 
 
 30
 Applying the principles enunciated in Chung, the district court found that the procedures afforded Skehan fully satisfied the requirements of due process. The district court found that: (1) Skehan received written notice of the grounds for termination; (2) a pretermination hearing was conducted by members of the Committee on Professional Affairs; (3) Skehan was advised of the nature of the proceedings and was given the right to present witnesses at the hearing but chose not to participate; (4) Skehan received a copy of the committee's findings of fact and final recommendation, dated April 10, 1978, recommending that his contract be terminated; and (5) Skehan's counsel was provided with a tape of the proceedings and was able to file post-hearing briefs. App. at 919a-923a. Having reviewed the evidence before the district court, we agree that the pretermination procedures afforded Skehan satisfied the requirements of due process.
 
 
 31
 Skehan contends that the above procedures failed to satisfy the requirements of due process because (1) he was "bombarded with contradictory proposals and authoritative announcements as to the identity of his accuser, the identity of the hearing body that would hear his case, and the time and place of hearing," Appellant's brief at 46; (2) he was not provided a transcript of the proceedings before the Committee on Professional Affairs; and (3) attorneys from the same agency advised the Committee and the College President, and presented the charges against Skehan to the Committee on behalf of the College.
 
 
 32
 We do not agree. The record does show some evidence of initial confusion as to the date[12] and identity of the hearing body.[13] However, on January 11, 1978 Skehan wrote to all members of the Committee on Professional Affairs, the body ultimately designated to conduct the hearing, stating that he would not attend the meeting on January 14, 1978, which clearly establishes that on that date Skehan was aware that a meeting would take place on January 14, 1978 but that he voluntarily chose not to attend on the ground, inter alia, that the College president failed to sign the charges. The record also establishes that while no transcripts of the hearings were provided, due to the unavoidable absence of the reporter who had been scheduled to attend, the hearings were tape recorded and the tapes were made available to Skehan's attorney. Skehan suggests the College should have notified him that a new nine-member committee had been formed. Since he declined to attend the hearing allegedly because of the failure of Dr. McCormick to sign the charges, we do not believe that the apparent failure to notify Skehan that the committee was reconstituted amounted to a denial of due process. Although he may not have known at that time that the hearing committee was expanded to the full nine-member Committee on Professional Affairs rather than the smaller group to which he had objected, he concededly was aware of the composition of the hearing committee by the second meeting when he appeared before it. He did not at that time or thereafter change his position and participate. Therefore under these circumstances, we cannot conclude that the failure to notify him of the reconstituted hearing committee violated any of Skehan's rights.
 
 
 33
 With regard to the involvement of the attorneys from the Pennsylvania Attorney General's Office,[14] the district court found no violation of Skehan's due process rights:
 
 
 34
 Plaintiff has submitted nothing to indicate that the three individuals involved in any way influenced the decision of the hearing committee. The fact that all were employed by the same agency is not sufficient. Moreover, it is undisputed that the role of the Assistant Attorney General advising the committee was merely to advise it on procedural and evidentiary matters subject at all times to being overruled by the Committee. Moreover, affidavits submitted by the Committee's counsel explain in detail his actions and show no basis to conclude that Plaintiff's due process rights were not respected.
 
 
 35
 App. at 922. In Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), the Court considered a claim that a Wisconsin procedure which authorized the state's medical hearing board to "investigate, hear and act upon" practices by doctors and order temporary suspensions violated procedural due process. In rejecting this claim, the Court held that the combination of investigatory and adjudicatory functions in an administrative agency does not in and of itself amount to a denial of procedural due process and that before such a combination of functions can be found violative of due process there must be a showing that the combination interferes with the "honesty and integrity" of the adjudicator, and that there is such a risk of "actual bias" that the practice must be forbidden if due process is to be afforded. Id. at 47, 95 S.Ct. at 1464. See also Hoke v. Board of Medical Examiners, 395 F.Supp. 357 (W.D.N.C.1975) (three-judge court) (holding that combined role of Board of Medical Examiners under state statute as investigator and adjudicator does not constitute a denial of due process). Here Skehan did not allege that the hearing committee performed multiple functions, but merely that the attorneys advising the committee and the President of the College were employed by the same office as the attorney presenting the facts in favor of termination.
 
 
 36
 Skehan does not allege any specific improper conduct or bias on the part of these attorneys. In fact, the three different attorneys were originally assigned to the Skehan case so as to avoid unfairness "so that each level of review will be able to act independently of the prior level." Letter to Skehan from Deputy Attorney General Gerald Gornish (Oct. 24, 1977), App. at 480a. We find that under the facts of this case, the involvement of the three attorneys from the Pennsylvania Attorney General's Office did not amount to a denial of due process.
 
 
 37
 Accordingly, we conclude that the procedures afforded Skehan satisfied the requirements of due process. He was fully informed of the charges against him prior to the hearing and was presented with an opportunity to be heard and to present witnesses before a neutral hearing body, but chose not to participate. Under the standards established in Chung v. Park, 514 F.2d at 387, the procedures were "adequate to prevent unreasonable, arbitrary or capricious termination decisions."
 
 
 38
 Finally, we turn to Skehan's contention that the district court erred in failing to conduct a hearing regarding his motion to enforce the July 20, 1977 judgment of the district court. Skehan contends that he relied upon an indication by the trial judge that there would be a hearing and that the failure to conduct a hearing precluded him from introducing additional evidence in support of his motion at such a hearing.
 
 
 39
 An order entered in this case by the district court on May 2, 1980, prior to the submission of Skehan's motion, provided: "Submissions and determinations of motions shall be upon briefs, without hearing or oral argument, unless the court specifically directs otherwise." At a conference with the district court on September 10, 1980, following filing of the motion in question, the district judge specifically asked Skehan's counsel whether there was a need for a hearing on this motion:
 
 
 40
 THE COURT: Well, is it going to be a need for a hearing on the motions, for instance, to enforce the Court order?
 
 
 41
 MR. GLASSBERG: We believe we have contained all our facts in the affidavit and that it can be decided on the brief and the affidavit-rather, the motion and the affidavit in support of the brief.
 
 
 42
 App. at 772a. While the court at the same hearing did indicate its reluctance "to decide anything on affidavits," and interpreted the standing order regarding decisions on briefs alone as inapplicable if there were any factual items in dispute, the court did not make a conclusive determination that a hearing would take place. Furthermore, Skehan does not allege that he specifically requested a hearing at any time prior to the ultimate disposition of his motion on December 5, 1980.[15]
 
 
 43
 In considering Skehan's motion to alter or amend the court's order denying his "motion to enforce the judgment", the district court ruled that "an evidentiary hearing is not required in order for the Court to determine what type of hearing was required by its order" and that plaintiff's motion "raises nothing to warrant altering the Court's conclusion that the undisputed facts show that the hearing provided Plaintiff satisfied the requirements of due process." App. at 935a-936a. At least two Federal Rules of Civil Procedure, Rule 43(e) and Rule 78, authorize the district court to dispense with hearings in appropriate circumstances. The district court was fully cognizant that a hearing would be required if there were contested material factual issues upon which its determination would rest. We see no reason to disturb its conclusion that the question presented by Skehan's motion was properly determined on the basis of the briefs and the detailed affidavits submitted by the parties. Indeed, in reaching its decision, the district court relied primarily upon the facts contained in Skehan's own affidavit.
 
 
 44
 Although we conclude that the district court did not err in declining to award back pay to Skehan and declining to require still another hearing on his dismissal for cause, we do not leave this case without some lingering uneasiness. The findings of the Committee on Professional Affairs that "the decision not to renew Dr. Skehan's contract was for reasons which were violative of his academic freedom" and that it "has seen no convincing evidence that Dr. Skehan would not have been rehired had he remained silent about campus issues," App. at 589a, have not been vindicated. The College chose to ignore the Committee's recommendation that Skehan's status and contract renewal should be reconsidered and that he should be reinstated and given a teaching assignment in the interim. The prior holdings in this litigation, and the applicable law, permitted the College to rely instead on the dismissal for cause decision, a decision that was upheld by a majority of the same faculty committee. This lengthy and divisive dispute could easily have been avoided by establishment by the College and the faculty of comprehensive policies covering both substance and procedure of all decisions affecting faculty status, including dismissal for cause. We return to a theme sounded previously, that the courts are hardly the best fora for resolution of academic disputes. See Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216, 218-19 (3d Cir. 1980), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981). We continue to hope that the same spirit of light, of liberty, and of learning which we believe characterizes places of higher education[16] applies not only to faculty and student learning and research but also to the relations between faculty and administration.
 
 
 45
 For the reasons set forth above, the orders of the district court denying Skehan's motion for an award of special damages and his motion to enforce the judgment of July 20, 1977 will be affirmed.
 
 
 
 [1]
 The reported decisions are Skehan v. Board of Trustees of Bloomsburg State College, 353 F.Supp. 542 (M.D.Pa.1973); 358 F.Supp. 430 (M.D.Pa.1973), vacated and remanded, 501 F.2d 31 (3d Cir. 1974), vacated, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), remanded, 538 F.2d 53 (3d Cir. 1976) (en banc), cert. denied, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976), on remand, 431 F.Supp. 1379 (M.D.Pa.1977); 436 F.Supp. 657 (M.D.Pa.1977), aff'd in part, rev'd in part, 590 F.2d 470 (3d Cir. 1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979), on remand, 501 F.Supp. 1360 (M.D.Pa.1980)
 
 
 [2]
 In our opinion which was reviewed by the Supreme Court we had also held that if the College did not share Pennsylvania's immunity, the district court must consider awarding Skehan attorney's fees, as well as back pay, as a private attorney general vindicating a public interest in having state-related institutions comply with the Fourteenth Amendment. 501 F.2d at 44-45. The Supreme Court directed that we consider the effect of Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In our en banc reconsideration, we held that Alyeska foreclosed recovery of attorney's fees on the private attorney general theory but not on the basis of litigation obduracy. 538 F.2d at 55-59. As we noted in the text, the attorney's fee issue has been settled and is not before us
 
 
 [3]
 Act of September 28, 1978, 1978 Pa.Laws 788, Act No. 1978-152. The Act reaffirms the doctrine of sovereign immunity, see § 1 (codified at 1 Pa.Cons.Stat. § 2310), but permits limited waiver of protection from tort liability in eight specific areas, see § 2 (originally codified at 42 Pa.Cons.Stat. § 5110; currently codified at 42 Pa.Cons.Stat. § 8522). Section 5(e) of the Act (codified at 42 Pa.Cons.Stat. § 8521(b)) provides that "(n) othing contained in this act shall be construed to waive the Commonwealth's immunity from suit in federal courts guaranteed by the eleventh amendment to the United States Constitution."
 
 
 [4]
 We also rejected Skehan's argument that the holding in Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that local government entities may be deemed "persons" within the meaning of 42 U.S.C. § 1983, compels the conclusion that section 1983 must be construed as a Congressional waiver of the state's Eleventh Amendment immunity. 590 F.2d at 488-91
 
 
 [5]
 The court found that the language of Article I, section 11 of the Pennsylvania Constitution was neutral with respect to sovereign immunity. This section provides, "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature may by law direct." See 479 Pa. at 399-400, 388 A.2d at 716-17
 
 
 [6]
 Congress' power to provide for suits against states in federal courts implementing a constitutional provision is not at issue here. See, e.g., Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (upholding the power of Congress to authorize private suits under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1976 & Supp. III 1979), for money damages in federal courts against unconsenting states liable for employment discrimination in violation of the Fourteenth Amendment); Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (approving an award of attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976), payable from the state treasury in an action in federal court against state officers to correct unconstitutional conditions in the Arkansas state prison system)
 
 
 [7]
 In view of our disposition of this issue, we need not address appellee's additional contention that under the Supreme Court's dictum in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), denial of compensatory damages was proper since such an award would constitute a "windfall" to Skehan rather than compensation because his termination was justified and would have occurred even if due process had been provided
 
 
 [8]
 In an accompanying order, the court detailed the dismissal procedures to be afforded Skehan:
 
 
 [11]
 A pretermination hearing may, at the option of the President of (the College), be held within 30 days after the Board of Trustees determines whether or not to renew Skehan's employment contract or within 30 days after another final decision has been reached on the question of renewal or non-renewal, whichever shall first occur
 
 
 [12]
 If no pretermination hearing is conducted within the time period set forth in the preceding paragraph, Skehan shall be reinstated to the position he held on October 7, 1970
 
 
 [436]
 F.Supp. at 668-69. These paragraphs starkly contrast with paragraphs 3 through 10 of the same order which set forth detailed instructions for the nonrenewal proceedings that tracked Article 9
 
 
 [9]
 Article 9 of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College set out the formal procedures applicable to the dismissal of a tenured faculty member. It provided first for discussion between the faculty member and the appropriate administrative officers, followed by reference to the Committee on Professional Affairs of the Faculty. In the absence of adjustment, the Committee was to recommend to the President of the College whether in its view formal proceedings to consider the dismissal of the faculty member should be instituted. Notice to the faculty member including a detailed written explanation of the reasons for the action was required before any such proceedings. The action of the President was final, although the faculty member could request further consideration by the President. If the President of the College reaffirmed the action, the faculty member could request a hearing, to be held within thirty (30) days, before an ad hoc hearing committee (of five (5) members and two (2) alternates) elected by the Faculty of the College. That committee was to present its report, along with recommendations, to the President of the College and the Board of Trustees within thirty (30) days after the date of the completion of the hearing. The faculty member had the right to be present at the meeting of the Board of Trustees when the report of the ad hoc hearing committee was considered and could be accompanied by an advisor, although not legal counsel, both there and at the meetings of the ad hoc committee
 
 
 [10]
 Appellees contend that Skehan has waived his claim of entitlement to a right to Article 9 procedures by failing to press such a claim at the preliminary injunction hearing in 1973, at the time that record was stipulated as the record on the motion for permanent injunction, or at the hearing on the final remedy. In light of our disposition of this appeal, we need not reach that issue
 
 
 [11]
 The 1940 Statement of Principles on Academic Freedom and Tenure of American Association of University Professors provided:
 Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should be informed before the hearing in writing of the charges against him and should have the opportunity to be heard in his own defense by all bodies that pass judgment upon his case. He should be permitted to have with him an adviser of his own choosing who may act as counsel. There should be a full stenographic record of the hearing available to the parties concerned.
 
 
 [12]
 As noted in the text, Assistant Attorney General Frank's letter to Skehan, dated January 5, 1978, correctly informed him that the hearing would take place on January 14, 1978. The letter to Skehan on the same date from Deputy Attorney General Levinson inexplicably stated that the hearing would be held on January 12, 1978. App. at 603a. Skehan however concededly knew that in fact the hearing would be held on January 14, 1978, as it was
 
 
 [13]
 Frank's letter originally notified Skehan that the hearing would be before a five-member committee composed of a representative chosen by the President and four members of the Committee on Professional Affairs. App. at 600a. Because Skehan objected to that committee, the President chose instead the nine-member committee which had served as the nonrenewal committee and, according to the President's special advisor, "had proved their objectivity by their recommendation in favor of Dr. Skehan in that matter." App. at 900a
 
 
 [14]
 Jack E. Solomon, Assistant Attorney General, Pennsylvania Department of Education, served as counsel to the Committee on Professional Affairs; Howard Levinson, Deputy Attorney General, Pennsylvania Department of Justice, served as attorney for Bloomsburg State College and presented the case on behalf of the Commonwealth at the hearings; C. Glendon Frank, Assistant Attorney General, served as advisor to College President McCormick. Although these attorneys had different titles, the appellees explain that at the time of the hearing Assistant Attorneys General were assigned to various Commonwealth agencies, while Deputy Attorneys General were employed by the Pennsylvania Department of Justice and therefore the titles of the attorneys were not reflective of rank
 
 
 [15]
 At most, Skehan in his reply brief filed in the district court in support of his motion to enforce the 1977 judgment, "suggested that a hearing be conducted in order to form a basis for determining both factual and legal issues." App. at 915a. (emphasis added)
 
 
 [16]
 See Speech by B. Disraeli, House of Commons (March 11, 1873), reprinted in II Selected Speeches of the Late Right Honorable the Earl of Beaconsfield 377 (T.E. Kebbell ed. 1882)