**Father Bernard R. PAGANO, Plaintiff,**

v.

**Detective Timothy HADLEY, Detective Thomas Shannon, Detective Warren Scheuler, Jr., Corporal Albert Ament, John H. Wilding, Magistrate, and the State of Delaware, Defendants.**

Civ. A. No. 81–381.

United States District Court,
D. Delaware.

March 9, 1982.

---

John T. Owens, Wilmington, Del., for plaintiff; Alfred R. Fabricant, of Shea & Gould, New York City, of counsel.

Edward F. Kafader, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants—State of Delaware and the Individual Defendants in their Official Capacities.

H. Murray Sawyer, Jr., Wilmington, Del., for defendants in their Individual Capacities.

## OPINION

STAPLETON, District Judge.

This is a case about mistaken identity. It began with the arrest of Father Bernard T. Pagano, a Catholic priest, on February 27, 1979. Police charged that Father Pagano, in addition to serving the parishoners of St. Mary's Refuge of Sinners Church in Cambridge, Maryland, led a secret life as the "Gentleman Bandit" responsible for a series of liquor store holdups in the Wilmington area. After arresting Pagano, Delaware State Police officers brought him before Justice of the Peace John H. Wilding for arraignment. Wilding ordered the priest committed to Delaware State Hospital for psychiatric evaluation.

On August 23, 1979, shortly after the State finished presenting its case-in-chief at trial, prosecutors dismissed the armed robbery charges against Father Pagano, revealing that Ronald W. Clouser had confessed that it was he, not the priest, who had committed the Gentleman Bandit crimes.

Almost two years later, on August 20, 1981, Father Pagano returned to court, this time as a plaintiff. The Complaint, against Justice of the Peace Wilding, the State of Delaware, and four State Police officers, alleges violations of 42 U.S.C. §§ 1983 and 1985, and a cause of action inferred directly from the Fourteenth Amendment to the Constitution.

This is also, unfortunately for Father Pagano, more than just a case about the embarrassment and injury inflicted by a highly publicized criminal charge. It involves as well the doctrines of judicial immunity and the immunity of States and State officials to suit in federal court. It is on these doctrines that Defendants rely to support the present Motion to Dismiss this action, in part, pursuant to Rule 12(b)(6), Fed.R. Civ.P.[1]

## I

### JUDICIAL IMMUNITY

Justice Wilding asserts an absolute immunity to suit, relying upon the Supreme Court's ruling in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). In *Stump* the Court delineated the scope of the judicial immunity doctrine it previously imported from the common law into the law governing claims under 42 U.S.C. § 1983. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Like the one now before me, the complaint in *Stump* sought compensation for an act by a judge which was alleged to exceed his legal authority.

---

1. The State has submitted material outside the pleadings in support of Justice Wilding's immunity claim, and Plaintiff has been on notice since January 26, 1982 that this aspect of the

Motion would be treated as a Motion for Summary Judgment under Rule 56. *See* Rule 12(c), Fed.R.Civ.P.

Linda Sparkman's mother submitted a petition to an Indiana Circuit Court judge, requesting that he order the sterilization of her fifteen year old daughter. Under Indiana law, Judge Stump had "original exclusive jurisdiction over all cases at law or in equity whatsoever..." including jurisdiction over the administration of estates, guardianships, and all proceedings not exclusively committed by law to another tribunal. 435 U.S. at 357, 98 S.Ct. at 1105.[2] Indiana law also provided an administrative procedure for the sterilization of institutionalized persons, subject to judicial review in the Circuit Court. 435 U.S. at 366, 98 S.Ct. at 1109 (Stewart, J., dissenting). The law did not confer any express authority on the Circuit Court to order sterilizations of individuals not already committed to state institutions; there was also no express statutory prohibition of such orders.

Judge Stump approved the petition, without affording the daughter the least rudiments of due process. The District Court concluded that the general grant of jurisdiction empowered the Circuit Court to order Linda Sparkman sterilized. The Sixth Circuit reversed. In a 5–3 decision, Justice Brennan not participating, the Supreme Court found Judge Stump immune to suit, notwithstanding the "tragic consequences" of his decision and the procedurally inadequate manner in which it was made.

■ Judicial immunity applies even when a judge is accused of acting maliciously or corruptly. *Pierson v. Ray, supra*, 386 U.S. at 554, 87 S.Ct. at 1217. As the Supreme Court has observed:

[Because it]...is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants..., he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decisionmaking but to intimidation.

*Id.* The *Stump* majority concluded that the same public interest in the exercise of judicial authority without "the apprehension of personal consequences" *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 374, 20 L.Ed. 646 (1872) applies to all judicial acts, except those done in the "clear absence of jurisdiction." *Stump, supra*, 435 U.S. at 357, 98 S.Ct. at 1105. "Judicial" acts were to be defined by "the nature of the act, *i.e.*, whether it is a function normally performed by a judge, and [by reference] to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Id.*, 435 U.S. at 362, 98 S.Ct. at 1107.[3]

■ There is little force to the contention that Magistrate Wilding's commitment order was not a "judicial act" as that term is defined in *Stump*. As Father Pagano correctly observes, judges in Delaware do not have the power to order involuntary civil commitments to Delaware State Hospital except under limited circumstances. Emergency commitments, for a period of up to seventy-two hours, require a physician to certify that the individual is "so mentally ill as to be likely to cause injury to himself or to others and to require immediate care,

---

**2.** This is one significant, but not dispositive, difference between *Stump* and the present case. Justices of the Peace in Delaware may exercise only the limited jurisdiction expressly conferred by statute. 10 *Del.C.* § 9202(b). *But see*, Rosenberg, *Stump v. Sparkman: The Doctrine of Judicial Immunity*, 64 Va.L.Rev. 833, 835–842 (1978), (arguing that the Indiana legislature exempted sterilization orders from its general grant of jurisdiction).

**3.** *Compare Zarcone v. Perry*, 572 F.2d 52 (2d Cir. 1978) (judge verbally abused coffee vendor and placed him in handcuffs); *Gregory v. Thompson*, 500 F.2d 59 (9th Cir. 1974) (judge physically assaulted plaintiff); *Lynch v. Johnson*, 420 F.2d 818 (6th Cir. 1970). *See Stump v. Sparkman, supra*, 435 U.S. note 10 at 361, 98 S.Ct. note 10 at 1107. *See also, Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) (alleged co-conspirators cannot invoke judicial immunity); *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 734–35, 100 S.Ct. 1967, 1975–76, 64 L.Ed.2d 641 (1980) (judges immune to antitrust suit in rulemaking capacity); *Groff v. Eckman*, 525 F.Supp. 375 (E.D.Pa.1981); *Neely v. Eschelman*, 507 F.Supp. 78 (E.D.Pa.1981); *Africa v. Anderson*, 510 F.Supp. 28 (E.D.Pa.1981).

treatment or restraint." 16 *Del.C.* § 5122. Judges play no role in this process. The Family Court and Superior Court do have exclusive jurisdiction, 16 *Del.C.* §§ 5001(3), 5002, to conduct probable cause hearings for involuntary patients within eighteen days of admission, 16 *Del.C.* §§ 5007, 5008; to hold a hearing to determine if the patient is mentally ill, 16 *Del.C.* § 5010; and to entertain petitions for a writ of habeas corpus following a final order of commitment. 16 *Del.C.* § 5013. Obviously, however, no such proceeding was involved in this case.

But this Delaware law relating to civil commitments does not demonstrate that the conduct here complained of was not a "judicial act". A commitment in default of bail is undeniably an act ordinarily performed by Delaware judges. Moreover, Delaware judges possess extensive authority during the course of criminal proceedings to require psychiatric evaluation and treatment of a defendant at state psychiatric facilities. Any judge, including a Justice of the Peace, 11 *Del.C.* § 2102(4), who is authorized to conduct a bail hearing, may set conditions of bail, including "[p]lac[ing] the person in the custody of a designated person or organization agreeing to supervise him," 11 *Del.C.* § 2108(2), and "requir[ing] psychiatric or medical treatment." 11 *Del.C.* § 2108(6). A court which may conduct preliminary hearings [4] and subsequent proceedings in criminal cases has the inherent power to require a psychiatric examination of a defendant by State psychiatrists in order to determine whether he or she is able to understand the proceedings and to assist in his or her own defense. See 11 *Del.C.* §§ 402, 404. After hearing, the Court may order the defendant confined to Delaware State Hospital for treatment. 11 *Del.C.* § 404. Persons acquitted by reason of insanity are automatically committed to Delaware State Hospital following the conclusion of the trial. 11 *Del.C.* § 403. While I do not suggest that any of these statutes empower Justices of the Peace to order commitment to Delaware State Hospital in default of bail, as Magistrate Wilding did in

this case, they do establish that such orders are "judicial" in the sense that they are the sort of act "normally performed by judges." Nor can there be any dispute that Father Pagano and his arresting officers dealt with Magistrate Wilding "in his judicial capacity." *Stump v. Sparkman*, 435 U.S. at 362, 98 S.Ct. at 1107.

The second prong of the *Stump* test poses the question whether Justice Wilding acted "in the clear absence of all jurisdiction." The majority in *Stump* approvingly quotes language from *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351–52, 20 L.Ed. 646 (1872) distinguishing between:

an excess of jurisdiction and the clear absence of all jurisdiction over the subject matter. Where there is clearly no jurisdiction over the subject matter any authority exercised is usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction should be exercised are as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgment may depend.

435 U.S. note 6 at 356, 98 S.Ct. note 6 at 1104. Father Pagano contends both that Justice Wilding acted in the "objectively" clear absence of jurisdiction, and that he "subjectively" knew that he lacked authority to order commitment to the Delaware State Hospital.

In the early morning hours of February 28, 1979, Delaware police officers brought Father Pagano before Magistrate Wilding for the purpose of setting bail. Wilding fixed bail at $15,000 full surety on each of eight counts. Father Pagano could not post the amount required. While Justice of the Peace Courts are courts of limited jurisdic-

---

4. Justices of the Peace had such authority in felony cases until 1978, but no longer do. *See*

11 *Del.C.* § 5910, Rule 5 Court of Common Pleas Criminal Rules (1978).

tion, 10 *Del.C.* § 9202(b), Father Pagano does not suggest that the Court did not have jurisdiction over the person of Father Pagano, or over the subject matter of the bail hearing. Nor does Father Pagano contend that Wilding could not have committed him to the custody of the State Department of Corrections in default of bail. His argument is that Magistrate Wilding lacked authority to commit him to the Delaware State Hospital and, accordingly, that in doing so, he acted in the clear absence of all jurisdiction.

For present purposes, I may accept the proposition that Magistrate Wilding lacked authority to commit Father Pagano to the Delaware State Hospital. The Delaware Courts have not ruled on the issue, but a ruling favoring Father Pagano's position would appear to be quite likely. There is no express authority for such action. Since by 1979 a Justice of the Peace Court's authority in felony cases had been limited to conducting bail hearings, it would have no occasion to determine a defendant's competence to stand trial and, accordingly, it would be difficult to find an inherent authority to commit for psychiatric evaluation. And, finally, contrary to Magistrate Wilding's contention, it is difficult to read the "conditions of release" provisions of the bail statute to prescribe "conditions of confinement." *See* 11 *Del.C.* § 2108.

■ It does not follow from this conclusion, however, that Magistrate Wilding acted "in clear absence of all jurisdiction" as that concept was articulated in *Bradley* and *Stump*. Assuming for the moment that Magistrate Wilding's designation of the Delaware State Hospital as the place of commitment is properly analyzed as a jurisdictional matter, *Stump* made clear that there is a difference between a lack of jurisdiction and a clear absence of all jurisdiction. Because jurisdictional, as well as non-jurisdictional, issues are frequently subject to debate, judges are entitled to decide such issues without fear of reprisals

in the event they exceed the limits of their authority. An actual absence of jurisdiction, accordingly, will not deprive a judge of absolute immunity if there is some rational basis upon which the judge might have concluded that he possessed jurisdiction. I conclude that a rational basis did exist in this case.

■ As noted, a Delaware Justice of the Peace has jurisdiction to deprive citizens of their freedom pending trial or satisfaction of the conditions of bail. He is also authorized to set the conditions for release on bail, including such conditions as placing "the person in the custody of a designated person or organization agreeing to supervise him" and requiring "psychiatric or medical treatment." 11 *Del.C.* § 2108(2) and § 2108(6). I cannot say that a judge who is in fact authorized to commit those accused of crime to a penal institution and who is in fact authorized to require psychiatric evaluation as a condition of bail release could not rationally think that he was authorized to remand a pretrial detainee for seventy-two hours of psychiatric evaluation rather than incarceration.

As earlier noted, Father Pagano's allegations go one step further, however. He alleges not only that Magistrate Wilding lacked authority to commit him to the Delaware State Hospital but also that he subjectively knew, and stated to the police officers, that he had no such authority. As Father Pagano points out, the *Bradley* case suggests, by way of dicta, that such a knowing usurpation of jurisdiction deprives the judicial officer of absolute immunity even where, from an objective point of view, there is no "clear absence of all jurisdiction." [5] Magistrate Wilding, on the other hand, argues that the essence of absolute immunity, as contrasted with a qualified immunity, is that it cannot be circumvented by alleging an absence of subjective good faith.

---

5. *See also Rankin v. Howard*, 633 F.2d 844 (9th Cir. 1980), *cert. denied*, 451 U.S. 939, 101 S.Ct.

2020, 68 L.Ed.2d 326 (1981).

When the *Bradley* case speaks of a knowing usurpation of jurisdiction, it does so in the context of a probate judge who tries criminal cases despite subjective knowledge that it is not within his power to entertain such a proceeding.[6] Our case, however, is not one in which the judge's jurisdiction to entertain the proceeding before him can be challenged. As previously noted, Magistrate Wilding had subject matter jurisdiction to entertain the bail proceeding before him. Father Pagano is complaining not about Magistrate Wilding's entertaining that proceeding, but about the manner in which he exercised his jurisdiction. Even if the relief he granted was beyond the relief he was authorized by law to give and would have been vacated in an appeal or a habeas corpus proceeding, this case is not materially different from the hundreds of cases in which absolute immunity has barred suit against judges who are alleged to have acted in bad faith in the course of proceedings over which they had subject matter jurisdiction. In order to fulfill its purpose, judicial immunity must be applied when judicial conduct is "alleged to have been done maliciously or corruptly." *Stump v. Sparkman*, 435 U.S. at 356, 98 S.Ct. at 1104.

In summary, I conclude that the challenged order can be characterized as a "judicial action", that it was not entered in the "clear absence of all jurisdiction," and that the allegation of bad faith does not deprive Magistrate Wilding of immunity.

## II

### ELEVENTH AMENDMENT IMMUNITY

The remaining individual defendants, Detectives Hadley, Shannon and Scheuler, and Corporal Ament, have moved to dismiss the claims against them in their official capacities, asserting a derivative immunity under the Eleventh Amendment. The State of Delaware has also raised this constitutional immunity to suit in federal court.

The Eleventh Amendment states, in relevant part, that the "judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State." The Amendment has been applied as well to actions against a State brought by its own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890).

### A. *Derivative Immunity*

"It has long been the rule…that the applicability of the Eleventh Amendment is to be judged not by who the nominal parties are, but by the nature and effect of the proceedings. It is said that, if the state is the 'real party in interest,' the suit is in reality 'against the State' and thus barred by the Eleventh Amendment." *Gordenstein v. University of Delaware*, 381 F.Supp. 718, 720 and note 4, (D.Del.1974). *See also, Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *West v. Keve*, 571 F.2d 158, 163 (3d Cir. 1978); *Skehan v. Board of Trustees*, 501 F.2d 31, 42 (3d Cir. 1974), *vacated on other grounds*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975) (Skehan I). By definition, the object of suing a state official in his or her official capacity is to make the State the real party in interest, and to make the deep pocket of the State available to satisfy a judgment. I will discuss whether the State retains its immunity below, after considering the effect of its insurance policy. Necessarily, however, any retained immunity cloaks State officials sued in their official capacity as well as the State itself.

---

**6.** *Bradley v. Fisher, supra,* distinguished two hypothetical situations. The first involved a probate court judge "invested only with authority over wills and the settlements of the estates of deceased persons" who proceeds to try a criminal case. *Id.* 80 U.S. (13 Wall.) at 352. Such a judge would have no immunity because "jurisdiction over the subject of offences [is] entirely wanting in the court." *Id.*

On the other hand, if a judge of a criminal court should try and convict a defendant of a crime which is not recognized under the law, "no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction." *Id. See Stump v. Sparkman, supra,* 435 U.S. note 7 at 357, 98 S.Ct. note 7 at 1105.

## B. Waiver

Father Pagano contends that Delaware has waived its immunity to this Court's jurisdiction by passing 18 *Del.C.* § 6511, which provides:

> The defense of sovereignty is waived and cannot and will not be asserted as to any risk or loss covered by the state insurance coverage program, whether same be covered by commercially procured insurance or by self-insurance, and every commercially procured insurance contract shall contain a provision to this effect, where appropriate.

Defendants have supplied the Court with the Affidavit of Arnold R. Olsen, (D.I. 22), the State's Director of Insurance Coverage, in an effort to rebut the presumption that it has waived its immunity to suit in the Delaware State courts under the doctrine of *Pajewski v. Perry*, 363 A.2d 429 (Del.1976). Instead, the affidavit firmly establishes that Delaware has abrogated its sovereign immunity with respect to Father Pagano's claims. The State has purchased an insurance policy covering such risks, and the statute speaks of waiving the defense of sovereignty as to any risk or loss covered by the insurance program. It is difficult to believe that the inclusion of a $25,000 deductible amount in the policy renders Section 6511 inapplicable. Indeed, if that were so, there would be nothing left for the policy to insure, since sovereign immunity would be preserved.[7]

Even if Father Pagano has a right to sue the State of Delaware in its own courts, it does not follow that he may sue the State in this forum as well. It is well established that a waiver of sovereign immunity does not automatically imply a waiver of Eleventh Amendment immunity and consent to suit in federal court. Indeed, as our Court of Appeals recently emphasized in *Skehan v. Board of Trustees*, 669 F.2d 142 (3d Cir. 1981) (Skehan III); *see*

also, *Kardon v. Hall*, 406 F.Supp. 4, 8 (D.Del.1975), federal courts will not assume that a State has voluntarily chosen to subject itself to their jurisdiction unless it has declared that choice in unmistakable terms. In the *Skehan* case, the issue was whether a decision of the Pennsylvania Court abrogating sovereign immunity also abrogated Eleventh Amendment immunity. Its analysis is applicable by analogy here:

> [E]ven if judicial waiver of Eleventh Amendment immunity were appropriate, we do not believe that the *Mayle* decision constitutes a waiver of such immunity. The Supreme Court has held that "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the test as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan*, 415 U.S. [651] at 673 [94 S.Ct. 1347 at 1360, 39 L.Ed.2d 662] (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 [29 S.Ct. 458, 464, 53 L.Ed. 742] (1909)). Similarly, in *Daye v. Commonwealth of Pennsylvania*, 483 F.2d [294] at 298, we also stated that "the conclusion by a court that there has been a waiver will not be lightly inferred" and that "when a waiver does take place it must be clear and unequivocal." This rule of clear and express waiver has been consistently applied in cases in which a state has consented to suit in its own courts by statute; absent a clear declaration of a state's consent to a similar suit against itself in federal court, such consent has not been inferred. *See Kennecott Copper Corp. v. State Tax Commission*, 327 U.S. [573] at 577 [66 S.Ct. 745 at 746, 90 L.Ed. 862]; *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 465 [65 S.Ct. 347, 351, 89 L.Ed. 389] (1945); *Great Northern Life Insurance Co. v. Read*, 322 U.S. 47,

---

7. The State also urges that Section 6511 permits a partial waiver of immunity so that its liability is limited to the $200,000 policy limits of its insurance contract. While this reading seems inconsistent with the language of the statute, I need not resolve this issue of State law. For the reasons stated below, I conclude that this waiver of the defense of sovereignty does not entail a corresponding waiver of Eleventh Amendment immunity.

54–55 [64 S.Ct. 873, 876–77, 88 L.Ed. 1121] (1944). The situation here is analogous.

The opinion of the Pennsylvania Supreme Court in *Mayle* does not, by even the most liberal standards, constitute a clear and unequivocal waiver of Eleventh Amendment immunity... Except to note that the Pennsylvania legislature had refused to ratify the Eleventh Amendment when it was proposed by Congress, the *Mayle* opinion does not discuss, either expressly or impliedly, the question of waiver of Pennsylvania's federal constitutionally-based immunity from suit in federal court. Rather, the opinion focuses on the judicially-created common law doctrine of sovereign immunity.

In light of the requirement applicable in this case that states must clearly and expressly waive their Eleventh Amendment immunity to suit in federal court, we cannot infer that the *Mayle* court's waiver of Pennsylvania's immunity under state law constitutes a waiver of its Eleventh Amendment immunity....

The controlling question, accordingly, is whether Section 6511 unmistakably evidences an intention on the part of the Delaware General Assembly, in 1969, that Delaware would henceforth be open to suit in the federal courts. Unfortunately, we have only the language of the statute itself to assist us in answering this question. That text suggests a conclusion contrary to that which Father Pagano would have me draw. The statute waives a single defense—the "defense of sovereignty." The obvious reference is to the "common law doctrine of sovereign immunity." It requires considerable liberality of construction to include within that reference to a single defense an additional, entirely distinct concept relating to a constitutional limitation on the "judi-

cial power of the United States." Even if one were to grant that a rational argument can be made in favor of construing the statute to waive Delaware's right under the Eleventh Amendment, however, one cannot say that Section 6511 provides clear indication of such a legislative intent.[8]

■ The Eleventh Amendment bars this action against the State, and against its agents in their official capacities. It may, of course, proceed against the officers in their individual capacities. *See West v. Keve, supra,* 571 F.2d at 163.

### III

### A FOURTEENTH AMENDMENT CAUSE OF ACTION

Father Pagano asserts a cause of action against the State of Delaware derived from the text of the Fourteenth Amendment. In *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court fashioned a damages remedy against federal officials for violations of the Fourth Amendment. Subsequently, in *Davis v. Passman,* 442 U.S. 228, 242, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979), holding that individuals having "no effective means" of redressing constitutional violations "must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights," the Court found a damage action under the Fifth Amendment. If it were purely a matter of texts, it would be difficult to distinguish this case from *Davis, supra,* since in both cases the relevant language is the due process clause. But, as the Supreme Court made unmistakable in *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), one must look at the other available remedies as well before implying rights under a *Bivens* theory.[9]

---

**8.** Father Pagano relies heavily on *West v. Keve,* 571 F.2d 158 (3d Cir. 1978). The Court of Appeals did not hold in *West* that Delaware has waived its Eleventh Amendment right. It remanded the case to this Court to resolve that specific issue.

**9.** The *Carlson* approach is similar to the analysis the Court has used in recent years to infer causes of action from federal statutes. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Touche Ross v. Reddington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1978); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d

Plainly put, if there were a cause of action latent in the Fourteenth Amendment, Section 1983, that traditional weapon of civil rights litigants, would be superfluous. There would simply be no need to create a right to relief at law or in equity, if the Fourteenth Amendment conferred such a right by itself. The relative contemporaneity of the Civil Rights Act and the Fourteenth Amendment makes this theory untenable. *See also,* Nowak, *The Scope of Congressional Power to Create Causes of Action Against State Governments, and the History of the Eleventh Amendment and Fourteenth Amendment,* 75 Colum.L.Rev. 1413, 1458–59 (1975).

Furthermore, Section 1983 is a broad and flexible remedy, unlike the Federal Tort Claims Act. *See Carlson v. Green, supra,* 446 U.S. at 22, 100 S.Ct. at 1473. The only difference to which Plaintiff points between the Section 1983 remedy and one supposedly implicit in the Fourteenth Amendment is that *respondeat superior* liability would lie against the State in a direct constitutional action. He offers no rationale, however, for applying the doctrine of *respondeat superior* to claims under the Fourteenth Amendment while refusing to apply it to identical claims asserted under Section 1983.[10]

■ The Third Circuit has declined to resolve this issue on numerous occasions. *See Mahone v. Waddle,* 564 F.2d 1018 (3d Cir. 1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Gagliardi v. Flint,* 564 F.2d 112, 115–16 (3d Cir. 1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Rogin v. Bensalem Township,* 616 F.2d 680, note 19 at 685 (3d Cir. 1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981) (connecting cases). *But see, Gagliardi, supra,* 564 F.2d at 117 (Gibbons, Jr. concurring) (contending that the issue was re-

solved affirmatively in *Rotolo v. Borough of Charleroi,* 532 F.2d 920, 922 (3d Cir. 1976) (per curiam)). Although this Court at one time expressed the view that a Fourteenth Amendment cause of action did lie against municipalities, *see Connell v. City of Wilmington,* C.A. 76–182 (D.Del., May 3, 1977), Memo.Op. at 13–14, it has reached the opposite conclusion on at least three occasions since then. *Blake v. Town of Delaware City,* 441 F.Supp. 1189, 1196–97 (D.Del. 1977); *Malloy v. City of Wilmington,* C.A. 78–374 (D.Del., May 11, 1981), Memo.Op. note * * at page 6; *Hayes v. City of Wilmington,* 451 F.Supp. 696 (D.Del.1978). I am persuaded that a direct damages action is not implicit in the Fourteenth Amendment, and I reaffirm the prevailing view here.

### IV

### CONCLUSION

For the reasons stated herein, I will enter judgment for the State of Delaware and Justice Wilding, and for the police Defendants in their official capacities.

---

146 (1979); *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

**10.** The Supreme Court has unequivocally rejected respondeat superior liability under Section 1983. *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).