**Kermit WEST, Plaintiff,**

v.

**Paul W. KEVE and Raymond W. Anderson, Defendants.**

Civ. A. No. 76–61.

United States District Court, D. Delaware.

June 11, 1982.

Brian J. Hartman, Community Legal Aid Society, Inc., Wilmington, Del., Of Counsel—William Anderson, of Anderson, Converse & Fennick, York, Pa., for plaintiff.

John J. Polk, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

## I. INTRODUCTION

### A. Procedural History

Plaintiff Kermit West, a prisoner in the Delaware Correctional Center (DCC), brought suit against defendants Paul W. Keve and Raymond Anderson in February, 1976, alleging violations of his civil rights and of his Eighth Amendment right to protection from cruel and unusual punishment. He brought this action under 42 U.S.C. § 1983. The suit was dismissed upon findings that the requested elective surgery had been performed and that the plea for damages was barred by the Eleventh Amendment. Plaintiff appealed the dismissal and the Third Circuit reversed and remanded to this Court for findings not inconsistent with its opinion. *West v. Keve*, 571 F.2d 158 (3d Cir. 1978).

The district court's original dismissal construed the complaint not to state a claim against Keve and Anderson in their individual capacities. The circuit court's opinion, however, indicated that if read along with other elements of the record, "the complaint state[d] facts constituting a damage claim against the defendants in their individual capacities." 571 F.2d at 163. Consequently, this Court has before it issues of Eleventh Amendment immunity and waiver, whether the defendants are liable in

their individual capacities, and whether the delay in scheduling West's operation constituted "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). The issue of whether West was denied adequate post-operative care, 571 F.2d at 162, was dropped by agreement of the parties.

### B. Factual Background

In the late summer and early fall of 1974, medical examinations of plaintiff West indicated that he was suffering from a moderate to severe case of varicose veins in the lower portion of his right leg. His condition was complicated by the presence of an ulcer or open sore on the leg in the same area as was generally swollen from the chronic venous stasis. West suffered considerable, though varying, amounts of pain throughout the period from August, 1974, to March 11, 1976, when surgery was performed to alleviate the condition. Surgery was first recommended in October, 1974, but the examining physician noted that elective surgery for DCC inmates was temporarily precluded by the lack of state funds. Surgery for West was neither scheduled nor performed at that time.

On June 20, 1975, the Community Legal Aid Society, counsel for West, wrote to defendant Keve in his capacity as an official of the DCC,[1] and informed him of West's complaint about delayed medical treatment. The letter indicated that West was willing to pay for the surgery. Keve referred the matter to Anderson, the Superintendent of the DCC.[2] Anderson, in turn, requested that Nurse Mary O'Meara, not a defendant in this action, monitor West's condition and report to him. Testimony by both Keve and Anderson indicates that this was the typical pattern of delegation at DCC for non-emergency medical care during the 1975–76 period. (T–8–9, 80–85). There was no full-time doctor at DCC during the period and the goal of improving medical care at DCC was a concern of both Anderson and Keve. (T–73, 88).

Nurse O'Meara did not report back to Anderson and neither he nor Keve took any steps to follow-up on West's case until October 10, 1975, after receiving a second letter from West's attorney.[3] The letter, which both Anderson and Keve received, threatened suit if the operation was not scheduled by October 24, 1975. Anderson directed O'Meara to schedule the operation. Keve asked his administrative assistant, Milton Horton, to oversee scheduling the operation. Horton wrote to West's attorney on October 29, 1975. In his letter, Horton acknowledged the possibility of a civil suit but stated that DCC's best efforts would not permit it to meet the deadline West's attorney had set.

This suit was filed on February 9, 1976. West's surgery was scheduled for February 25, 1976, but was postponed because West's EKG was abnormal. The surgery was finally performed March 11, 1976.

## II. ELEVENTH AMENDMENT IMMUNITY

The Third Circuit's opinion remanding this case requires this Court to determine whether 18 *Del.C.* § 6511[4] constitutes a waiver of the state's Eleventh Amendment immunity. The circuit court did not have before it evidence of liability insurance of the type mentioned in § 6511 and did not

---

1. Trial Exhibit 14. The record indicates that Keve was the Director of the Division of Adult Correction from October 16, 1973 to October 1, 1976 and Acting Commissioner of Corrections from July 1, 1975 to October 1, 1976.

2. T–39; Anderson was Superintendent at DCC from 1971 through March 1, 1976.

3. Trial Exhibit 16.

4. § 6511 Defense of Sovereignty Prohibited.
  The defense of sovereignty is waived and cannot and will not be asserted as to any risk or loss covered by the state insurance coverage program, whether same be covered by commercially procured insurance or by self-insurance, and every commercially procured insurance contract shall contain a provision to this effect where appropriate.

decide whether the existence of such insurance would constitute a waiver.[5]

In his initial opinion dismissing the suit on Eleventh Amendment grounds, Judge Latchum cited *Kardon v. Hall*, 406 F.Supp. 4 (D.Del.1975) and relied upon the standard for finding state waiver of Eleventh Amendment immunity developed in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In *Edelman*, the Supreme Court stated:

> In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction."

415 U.S. at 673, 94 S.Ct. at 1360–61 *quoting Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). In remanding this case, the Third Circuit's 1978 opinion suggested that the basic reason for the *Edelman* standard was to protect state treasuries. "The rationale for construing a waiver narrowly is to protect the state treasury, and when a state is insured against the loss from a claim, that rationale is attenuated." 571 F.2d at 164. The Third Circuit went on to suggest that if insurance existed in this case, there might be reason to apply a standard of analysis somewhat different from that adopted in *Kardon, supra*, where an award of damages would have directly invaded the Delaware treasury.

■ There is no doubt either that a principal goal of the Eleventh Amendment is to protect state treasuries[6] or that by purchasing insurance and paying premiums, a state legislature in effect "liquidates" its damages and greatly mitigates, if not eliminates, the relationship between any given damage award and the state treasury. It is equally clear, however, that the Eleventh Amendment codifies a relationship between sovereigns—the United States and the individual state governments. A waiver of sovereign immunity is not necessarily a simultaneous waiver of Eleventh Amendment immunity. *Kennecott Copper Corp. v. State Tax Comm.*, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Skehan v. Board of Trustees of Bloomsburg State College*, 669 F.2d 142 (3d Cir. 1982); *Pagano v. Hadley*, 535 F.Supp. 92 (D.Del., 1982). There is not only the question of whether a state's treasury may be invaded, but whether, in consenting to suit, a sovereign state has consented to submit to damages awards levied by courts other than those of its own creation.

■ The Supreme Court has indicated that there must be a clear declaration of a state's intention to submit its problems to the courts of the United States. *Edelman, supra; Great Northern Life Insurance Co. v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). In *Daye v. Commonwealth of Pennsylvania*, 483 F.2d 294, 298 (3d Cir. 1973), *cert. denied* 416 U.S. 946, 94 S.Ct. 1956, 40 L.Ed.2d 298 (1974), the Third Circuit indicated that "the conclusion by a court that there has been a[n] [Eleventh Amendment] waiver will not be lightly inferred" and "that when a waiver does take place it must be clear and unequivocal." In *Skehan, supra*, the circuit court's most recent guidance on the issue of Eleventh Amendment waiver, the court stated approvingly:

> This rule of clear and express waiver has been consistently applied in cases in which a state has consented to suit in its own courts by statute; absent a clear declaration of a state's consent to a similar suit against itself in federal court,

---

**5.** "We decline to decide whether Delaware has waived its Eleventh Amendment immunity, and we remand the case to the district court to determine if this type of loss is insured and, if so, whether Eleventh Amendment immunity has been waived." 571 F.2d at 164.

**6.** *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Great Northern Life Insurance v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944).

such consent has not been inferred. The situation here is analogous.[7]

The Court will apply this standard to 18 *Del.C.* § 6511.

■ Section 6511 of Title 18 of the Delaware Code[8] waives the "defense of sovereignty" as to any risk covered by the state insurance program. *See Pagano v. Hadley, supra; Hedrick v. Blake,* 531 F.Supp. 156 (D.Del.1982); *Pajewski v. Perry,* 363 A.2d 429 (Del.Supr.1976). There is no legislative history available relevant to the debate or passage of the section, so courts' interpretations are necessarily confined to the text of the statute. While it is not implausible to regard the phrase "defense of sovereignty" as encompassing more than simply common law or, in the case of Delaware, state constitutional[9] sovereign immunity, for the Court to find a waiver of Eleventh Amendment immunity, the legislature must have demonstrated its intent more clearly than through the use of such a phrase.

■ In the face of the likely intent of the legislature to waive only the defense of

sovereign immunity, the clause "[t]he defense of sovereignty is waived" fails to meet the "clear declaration" standard required by *Skehan, supra. Accord Pagano, supra.* Where denial of the federal forum is unlikely to leave plaintiff without a court in which to pursue his claim,[10] there is even more reason to conclude that the intent underlying § 6511 is to waive only the state's sovereign immunity. Delaware has not waived its Eleventh Amendment immunity from suit in this Court.[11]

The Eleventh Amendment bars this action against the State and against defendants Keve and Anderson in their official capacities. The Court now considers the liability of Keve and Anderson as individuals.

## III. INDIVIDUAL LIABILITY OF KEVE AND ANDERSON

■ Defendants Keve and Anderson are beneficiaries of the state's Eleventh

---

7.  669 F.2d at 148–49.

8.  *See* note 4 *supra.*

9.  Del.Const.Art. I, § 9. *See also Shellhorn v. Hill,* 187 A.2d 71, 72 (Del.Supr.1962) ("sovereign immunity is not judicially created in the State of Delaware [but] was established by our first Constitution and has been continued thereafter by successive Constitutions."); *Donovan v. Delaware Water & Air Comm'n,* 5th Cir., 358 F.2d 717 (1976) (sovereign immunity doctrine derived from state constitution).

10.  While the Eleventh Amendment prevents West from bringing in federal court his § 1983 retroactive damages action against Delaware or entities partaking of its sovereignty, the Court notes that it is well settled that state and federal courts have concurrent jurisdiction over § 1983 causes of action. *See Maine v. Thiboutot,* 448 U.S. 1, 3 n. 1, 100 S.Ct. 2502, 2503 n. 1, 65 L.Ed.2d 555 (1980), ("Any doubt that state courts may entertain such [§ 1983] actions was dispelled by *Martinez v. California....*"). *See also Martinez v. California,* 444 U.S. 277, 283–84 n. 7, 100 S.Ct. 553, 558 n. 7, 62 L.Ed.2d 481 (1980) ("We note that the California courts accepted jurisdiction of this federal claim. That exercise of jurisdiction appears to be consistent with the general rule...."). Although neither *Thiboutot* nor *Martinez* decided that state courts *must* entertain § 1983 claims, state courts of general jurisdiction are not generally

free to decline to enforce a federal claim. *See Testa v. Katt,* 330 U.S. 386, 394, 67 S.Ct. 810, 814, 91 L.Ed. 967 (1947); *Brown v. Gerdes,* 321 U.S. 178, 188, 64 S.Ct. 487, 492, 88 L.Ed. 659 (1944) ("Since 1789, rights derived from federal law could be enforced in state courts unless Congress confined their enforcement to the federal courts.") (Frankfurter, J., concurring). *See also* Hart & Wechsler, *Federal Courts and the Federal System* 434–38 (2d ed. 1973). If found to have waived sovereign immunity through the purchase of insurance or by some other means, *see* note 11 *infra,* Delaware would be liable for the improper treatment of its prisoners. The Court assumes without deciding that if sovereign immunity has been waived, this type of § 1983 action could be brought in Delaware state courts. In West's particular case, there remains the possibility that a state court action may be barred by the statute of limitations.

11.  The Third Circuit's opinion instructed this Court to place the burden of proving non-insurance upon the defendants. 571 F.2d at 164. The Court's resolution of the Eleventh Amendment question, however, obviates the need to examine whether the risk in question is insured within the meaning of 18 *Del.C.* § 6511 and the standard of waiver developed by the Delaware Supreme Court. *See Pajewski v. Perry,* 363 A.2d 429 (Del.Supr.1976).

Amendment immunity because a judgment against them in their official capacities would be a *de facto* judgment against the state. There remains, however, the assertion of individual liability inferred by the circuit court.[12] Prison officials do not enjoy the absolute immunity from suit afforded legislators, judges and prosecutors. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Instead, they may rely on an immunity qualified by "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action." *Scheuer v. Rhodes*, 416 U.S. 232, 247, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1973). *See Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). *Procunier, supra*, described the conditions under which prison officials' qualified immunity would cease to shield them from individual liability.

> [T]he immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.

434 U.S. at 562, 98 S.Ct. at 859.

■ In this district, the *Procunier* standard has been implemented in terms of several discrete inquiries. To be protected by his or her qualified immunity, an official must establish that he or she acted in good faith, without intending to violate any of plaintiff's constitutional or statutory rights and, further, that a reasonable person in the official's position would not have realized that his or her actions would violate a constitutional right. These two prongs of the test are sometimes referred to as the 'subjective' and 'objective' elements of an official immunity defense.

The second, or 'objective', standard itself involves three further inquiries by the court: (1) Was the right violated clearly established at the time of the action or conduct being complained of? (2) Would a reasonable occupant of defendant's office or position have been cognizant of his or her legal or constitutional responsibility? (3) Would a reasonable occupant of defendant's office or position have been sufficiently aware of the facts of the situation to have realized that his or her conduct violated a constitutional right? *Masjid Muhammed-DCC v. Keve*, 479 F.Supp. 1311 (D.Del. 1979).

### A. Subjective Good Faith

■ The Court is convinced that both Keve and Anderson acted in subjective good faith. Plaintiff argues that defendants have not met their burden of proving that they acted "without malice and without actually realizing that [their] conduct would violate plaintiff's rights." *Johnson v. Anderson*, 420 F.Supp. 845, 857 (D.Del. 1976). West's position depends primarily on Keve's and Anderson's status as defendants in *Derrickson v. Keve*, 390 F.Supp. 905 (D.Del.1975). In *Derrickson*, Judge Layton held that a life prisoner could not be completely denied access to elective surgery.

> In these circumstances, it would seem a decision by prison officials *never* to allow Plaintiff to elect surgery which the prison's own physician recommended would indeed by [sic] arbitrary, capricious and cruel. On the other hand, the law is clear that in failing to provide surgery *to date*, the authorities have not exceeded their discretion.[13]

Nothing in the record suggests that either Keve or Anderson intended to deny West the vein stripping operation that had been recommended for him. Indeed, nothing suggests that it was their wish even to delay the operation. It was not within the scope of either man's duties directly to schedule elective operations or to dispense ace bandages, pain killers or other medical assistance to the inmates.

**12.** 571 F.2d at 163.

**13.** 390 F.Supp. at 907 (emphasis original).

Neither defendant denied an overall administrative responsibility and concern for the quality of health care at DCC. Particularly in the case of Keve, it seems reasonable to the Court that he should concern himself with trying to increase the prison's medical budget and to procure for it the best possible medical staff. There is no reason that the Superintendent or the Director of DCC should routinely be aware of the surgical schedule for each prisoner entitled to elective surgery.

The evidence indicates that Keve and Anderson at all times took seriously the responsibilities of their respective positions, including medical care. Keve lobbied the legislature for more money for DCC medical care. (T–71–73). Keve and Anderson, upon deciding that Nurse O'Meara was incompetent, attempted to dismiss her. Despite their attempt, O'Meara was reinstated by an arbitration panel. (T–10). The reinstatement was over Keve's protest.

Neither Keve nor Anderson intended to abrogate West's right to adequate medical care and no reasonable official would expect that his actions in administering the DCC system would violate the constitutional rights of any prisoner in West's position. Both defendants have established their subjective good faith.

### B. Objective Good Faith

#### 1. Clearly Established Right

■ West persuasively argues that Keve and Anderson were on notice regarding a right to reasonably prompt access to elective surgery because they were defendants in *Derrickson, supra.* The Court finds that while *Derrickson* did not establish a particular threshold for when such delay becomes constitutionally infirm, a seventeen month interval between a physician's recommendation and the completion of surgery is "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle, supra,* 429 U.S. at 103–04, 97 S.Ct. at 290–91. The discomfort West suffered between

October, 1974 and March, 1976, could not reasonably be suggested to have served any legitimate penological purpose. The Court finds that prisoners' right to surgery more prompt than seventeen months after it is first recommended was well established at the time of West's complaint notwithstanding the fact that *Estelle* was not decided until November, 1976.

This district has found *Estelle* not to have changed the standard applicable to medical care claims under § 1983. *See Beamer v. Srivastava,* C.A.No. 76–286 (D.Del. February 17, 1977). Moreover, *Derrickson v. Keve,* 390 F.Supp. 905 (D.Del.1975) was decided during the same time period as West's ongoing request for the same type of elective surgery.[14] The length of the delay between the recommendation of surgery and its actual performance distinguishes this case from *Derrickson* and makes West's complaint even more compelling. Seventeen months of needless suffering from the delay of surgery was as constitutionally infirm from 1974 through 1976 as after the decisions in *Estelle* and *Derrickson.*

#### 2. Officials' Knowledge of the Law

■ As defendants in *Derrickson, supra,* both Keve and Anderson should have been aware that the duty of a correctional institution to protect the health of its inmates extended to providing reasonably prompt access to elective surgery. Both defendants testified to their general awareness of *Derrickson* and its import. As responsible officials of the criminal justice system, in constant contact with prison law, both men could reasonably be expected to be aware of prisoners' right not to have recommended surgery unduly delayed.

#### 3. Officials' Knowledge of Facts

■ The Court finds that neither Keve nor Anderson had or reasonably ought to have had sufficiently detailed knowledge of the particulars of Kermit West's case to be held individually responsible for the unac-

---

**14.** Defendants have not argued that *Derrickson,* handed down in March, 1975, was their first notice of prisoners' right to elective surgery.

ceptable delay in his treatment. Consequently, the Court finds that both Keve and Anderson are shielded from liability for individual damages by their qualified official immunity.

While Keve and Anderson shared, and, indeed, acknowledged, an overall responsibility for the constitutionally proper operation of DCC, they were not directly aware of every detail of prison life. Delegation of tasks and authority is an undeniable fact of institutional organization. In the realm of medical care, Keve and Anderson properly entrusted the part-time doctors and Nurse O'Meara with optimizing inmate care within the constraints of time, personnel and budget.

Plaintiff argues that Anderson was aware of West's condition because West had complained of and displayed his swollen leg to Anderson at a September, 1974, Adjustment Board hearing. (T–183–185). There is no indication, however, that West was being denied proper medical attention up to that point. In fact, the recommendation of surgical treatment was not made until October, 1974, on West's sixth or seventh visit to the clinic at the Wilmington Medical Center. At the time of the Adjustment Board hearing, there was no outstanding recommendation of surgery.

The Court finds that neither Keve nor Anderson had any actual notice that West needed an operation until Community Legal Aid wrote to Keve on June 20, 1975. The letter noted that West suffered severely swollen legs, but did not mention either that surgery had been recommended nine months earlier or that West had not been examined by a physician since his October discharge from the Wilmington Medical Center clinic. The letter did mention *Derrickson, supra,* but in the context of a distinction between 'elective' and 'emergency' surgery rather than to point out that delay was intolerable.

Overall, the Court finds that the June 20, 1975 letter was not sufficient to inform

Keve or Anderson that West's rights were being violated. Consequently, Keve's referral of the letter to Anderson and Anderson's memorandum referring the matter to Nurse O'Meara were not acts of deliberate indifference. In the context of the information available at the time, the decisions to refer the letter did not even constitute negligence.

Anderson's July 9, 1975 memorandum to Nurse O'Meara[15] requested that she provide him with information regarding West's need for an operation and the staff doctor's estimation of West's current condition. O'Meara did not reply and Anderson did not follow-up his request until after Keve had received a second letter from West's attorney, dated October 8, 1975. While O'Meara's three month delay in answering is certainly unacceptable and Anderson's failure to follow up is less than commendable, the Court has no evidence that West or his attorney complained of the delay in any way that reached the attention of Keve or Anderson between July and October, 1975.

Since Keve and Anderson have demonstrated that they did not, during this period, actually know any facts about delay in West's operation, the question becomes whether reasonable officials in their positions would have exerted more effort to follow up on their requests for information. The Court finds that given their reasonable lack of knowledge that West's operation had *already* been delayed for nine months, a three month delay in follow-up by Anderson and Keve was not unacceptable inattention to West's rights. During the course of O'Meara's non-compliance with Anderson's request, neither Keve nor Anderson knew when elective surgery had been recommended.

O'Meara's incompetence was not restricted to West's case. Anderson and Keve became sufficiently dissatisfied with O'Meara's performance that she was fired sometime between October, 1975 and February, 1976.[16] In the face of general incom-

---

15. Memorandum: Anderson to O'Meara, July 9, 1975. Trial Exhibit 15, p. 1.

16. As noted above, O'Meara's dismissal was subject to civil service requirements and she

petence and, perhaps even intransigence on the part of O'Meara, it was not unreasonable that Keve and Anderson interpreted their official responsibilities in terms of improving general medical care and replacing O'Meara rather than intervening in West's individual case. Neither inadequate performance by DCC health employees nor widespread deficiencies in the institution's medical performance excuses delay or any other abrogation of prisoners' constitutional rights. Given the conditions existing at DCC in the second half of 1975, however, a reasonable Superintendent or Director would not necessarily have made it his or her business to have mastered the particular facts of one prisoner's case requesting that elective surgery be scheduled. Neither Keve nor Anderson knew the extent of the delay in attention to West's condition and, however unfortunate, their continued ignorance between June and October of 1975 was not unreasonable under the prevailing circumstances.

Upon receipt of the October 8, 1975 letter from Community Legal Aid, both Keve and Anderson took steps to follow up on West's case. Although the letter did not mention how long West's operation had been delayed, the Court finds that informing Keve and Anderson that West had still not received his surgery effectively notified them that the delay had been substantial. Their response to the letter, however, was not unreasonable. Anderson wrote a strongly worded memo to O'Meara directing her to "go to the Delaware Hospital on Tuesday, October 14, 1975, and spend as much time as is necessary, but have these operations [for West and Derrickson] lined up and taken care of...." [17] Keve received a copy of this memo. In addition to Anderson's direct and specific command to O'Meara, Keve directed his administrative assistant, Milton B. Horton, to oversee the scheduling of West's operation.

Horton wrote to Community Legal Aid on October 29, 1976.[18] While Horton's letter was unsympathetic,[19] it did indicate that DCC was attempting to schedule West's surgery. At this point, when a reasonable official in the position of Keve or Anderson should have known enough facts to act to avoid or remedy a likely deprivation of West's constitutional rights, reasonable steps were taken. The DCC nurse was directed to schedule the surgery by going to the hospital on a particular day and taking as long as necessary to accomplish her task. West's case was to have the further supervision of the Director's administrative assistant.

Surgery was finally scheduled for February 25, 1976. The Court has no evidence of exactly when officials of DCC and the Wilmington Medical Center agreed on that date or whether surgery could have been scheduled any earlier. There was testimony that two to three month delays in scheduling non-emergency surgery of this type, even for members of the general populace, were not unusual. The lag in scheduling from October 10, 1975 to February 25, 1976, was slightly more than four months. During that time, Keve and Anderson knew or should have known that West's elective surgery was long overdue. In view of the condition of the DCC medical budget, the reluctance of the Wilmington Medical Center to accept further DCC inmates until DCC's bills were paid, and the priority of emergency over elective surgery, the four and one-half months in which Horton repeatedly assured defendants as well as Community Legal Aid that he was doing everything possible to schedule surgery was not an unreasonable period for Keve and Anderson to rely upon their subordinates' ability to carry out specific instructions to schedule West's operation.

Delay beyond February 26, 1976, was at the behest of Wilmington Medical Center

---

was reinstated by an arbitration panel over Keve's objections.

17. Memorandum: Anderson to O'Meara, October 10, 1975. Trial Exhibit 17, p. 1.

18. Trial Exhibit 18.

19. The closing paragraph of Horton's letter stated: "Your threat of suit very frankly turns me off and indicates clearly your lack of knowledge of the correction system and the problems involved in the administration of such a system."

physicians and based on their interpretation of an irregularity in West's electrocardiogram (EKG). It was beyond the control of either defendant.

## IV. CONCLUSION

The Court concludes that during the period in which West's elective surgery was unacceptably delayed, neither Keve nor Anderson had sufficient facts to indicate to him that West's rights were being violated. The Court further finds that under the circumstances prevailing at DCC between 1974 and 1976, defendants' ignorance of the particulars of West's situation was not unreasonable. At all times relevant to this case, these officials acted reasonably within the discretion and responsibilities associated with their respective positions. Defendants Keve and Anderson are shielded by their qualified official immunity from this § 1983 suit for retroactive damages against them in their individual capacities.

Since the parties against whom this suit is brought are immune, the Court finds it unnecessary to reach the constitutional questions of rights violations beyond the findings made in the course of deciding the immunity issues. The case against defendants Keve and Anderson is dismissed as to claims against them in both their individual and official capacities. This Opinion constitutes the Court's Findings of Facts and Conclusions of Law.