David Dean **DELKER**, SID # 4356356, Plaintiff,

v.

Manfred **MAASS**, Superintendent, Oregon State Penitentiary, Dr. John Vargo, Chief Medical Officer O.S.P.: Pat Lilienthal, Health Services Manager O.S.P., Defendants.

CV No. 92–1239–PA.

United States District Court, D. Oregon.

Feb. 2, 1994.

Jack Bernstein, Gladstone, OR, for plaintiff.

Theodore R. Kulongoski, Atty. Gen., and Jan Peter Londahl, Asst. Atty. Gen., Dept. of Justice, Salem, OR, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PANNER, District Judge.

Plaintiff David Delker brought this 42 U.S.C. § 1983 action seeking injunctive relief and damages from state and prison officials

who refused to authorize surgery for plaintiff's inguinal hernia. I granted summary judgment on some claims, and set the remaining claims for trial. The prayer for injunctive relief was mooted when the Oregon Department of Corrections "ODOC" authorized the operation. On December 2, 1993, I conducted a court trial at the Oregon State Penitentiary ("OSP"). At the conclusion of plaintiff's case-in-chief, I entered judgment for defendants Maass, Hall, and Lilienthal because they either played no role in, or lacked authority to make, the decision whether to authorize surgery. That leaves only the claim against defendant Vargo. These are my findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). I find for plaintiff.

## FINDINGS OF FACT

Plaintiff is presently an inmate at OSP. Shortly before his arrest, plaintiff was injured in an accident at a foundry. Plaintiff reported the injury to the medical staff at the Clackamas County Jail ("CCJ") in March, 1991, who diagnosed the injury as a left inguinal hernia that could be "easily reduced."

An inguinal hernia occurs when there is a small opening in the lining of the abdominal wall, and part of the intestine pokes through this hole. A hernia is "easily reducible" if, when the peritoneum bulges through the outer abdominal wall, the patient can restore the hernia sac to its proper position without the assistance of a doctor by either pressing on the sac or laying down. An inguinal hernia can become acutely incarcerated. An acutely incarcerated hernia that is not treated within 6 to 8 hours may become strangulated (*i.e.,* the intestinal loop protruding through the abdominal wall becomes constricted), a condition that may result in serious injury or even death. An acutely incarcerated hernia also causes severe pain. Even an unincarcerated hernia can cause pain and limit activity in some patients.

Following his conviction, plaintiff was transferred to the Eastern Oregon Correctional Institution ("EOCI"). The medical staff at EOCI noted plaintiff's hernia, yet classified him as "medically clear." Plaintiff

was assigned to kitchen duty. He slipped on a wet floor while carrying a heavy stack of metal trays, aggravating his hernia. When plaintiff sought medical attention, the staff at EOCI observed a "noticeable bulge LLQ" (lower left quadrant) and scheduled plaintiff to see a physician. The following day, plaintiff was examined by Dr. Joseph Diehl, Chief Medical Officer at EOCI, who observed a "fairly large left inguinal hernia which did reduce." Diehl immediately arranged for plaintiff to be transferred to OSP for surgical consultation. Plaintiff arrived at OSP on September 10, 1991. On September 16, he was examined by Dr. Degner, a physician at OSP, who confirmed the presence of a reducible left inguinal hernia, and recorded plaintiff's complaint that the hernia "hurts off and on," and was increasing in size. Plaintiff was scheduled for a surgical conference with Dr. Strauss, a consulting physician and surgeon with the ODOC, but plaintiff missed that appointment, apparently because his "pass" was late in arriving.

On September 30, plaintiff again met with Dr. Degner. The doctor recorded "physician's orders" in which he prescribed medication for a skin rash, and directed that plaintiff be rescheduled for the surgical consultation with Dr. Strauss. Dr. Degner's orders also contain the notation, "Full Work Clearance." On the same day, Dr. Degner approved a form declaring plaintiff to be "Medically Stable/Full Clearance," meaning there were no medical restrictions on the jobs to which plaintiff could be assigned at the prison. Dr. Degner says he issued the order at plaintiff's request because plaintiff wanted to work, but Degner's contemporaneous chart notes don't mention such a request. Plaintiff insists Dr. Degner raised the subject on his own initiative, and issued the order over plaintiff's objections.

Two days later, plaintiff was assigned to kitchen duty. Dr. Vargo testified this was light duty work with no heavy lifting, and could be performed without aggravating the hernia. However, plaintiff testified that his duties included unloading truckloads of supplies. He was also required to carry heavy objects on slick floors. Plaintiff testified that on two occasions a loop of intestine poked

through the abdominal wall, forcing him to "sit down and work the intestine back through the tear." He described these episodes as "very painful."

On October 7, 1991, plaintiff was examined by Dr. Strauss. Strauss' chart notes record a "progressive but reducible left groin bulge" of "moderate size." Strauss also noted plaintiff was complaining of "[q]uite a lot of activity related discomfort." Plaintiff contends Dr. Strauss advised that he was being placed on the "waiting list" for surgery, but that Dr. Vargo might not approve the surgery because the prison had a tight budget. Dr. Strauss' notes reveal that he directed plaintiff be "placed on the list for elective surgery pending approval by the Health Services Manager." Dr. Strauss's notes are initialed by Dr. Vargo, Chief Medical Officer at OSP.

Although Dr. Strauss had determined plaintiff was a candidate for surgery, and plaintiff had reported a lot of activity-related discomfort, Strauss did not change plaintiff's work assignment, or impose any restrictions on lifting. Plaintiff testified that Dr. Strauss promised to remove him from the work detail, but never did. Plaintiff says he finally enrolled in vocational training in order to escape the kitchen job. Prison records show plaintiff enrolled in a vocational training program on October 18, 1991, eleven days after his conversation with Dr. Strauss. Plaintiff testified that he was ultimately unable to complete that vocational program because the hernia "bothered me too much to stand for eight hours a day."

For the next five months, plaintiff waited patiently for word that his operation had been scheduled, but that day never arrived. On March 25, 1992, plaintiff sent a memo to OSP Superintendent Maass noting that he had been transferred to OSP nearly seven months earlier for the purpose of obtaining surgery for his hernia, but had yet to receive any treatment. Dr. Vargo wrote a curt response:

> You have received proper medical attention; multiple exams, of a long standing problem that you had with (sic) you came to prison. Dr. John Vargo, April 2, 1992.

Simultaneously, plaintiff sent a memo to Dr. Strauss asking when the hernia operation would be scheduled, and inquiring whether the operation was contingent upon the availability of funds. Dr. Vargo also responded to this memo:

> You are on list for elective surgery. This is not emergency or serious and will be operated only if it's worse. You came to prison with this benign non-serious condition. Dr. John Vargo, April 2, 1992.

On April 24, 1992, plaintiff sent a memo to Dr. Vargo, questioning how Vargo could say he had received adequate medical treatment when he still had the hernia and it was constantly bothering him. Plaintiff also asked whether he should interpret Vargo's response as a refusal to allow the surgery. Dr. Vargo replied:

> Interpret it as *not emergency.* You are on waiting list. It is elective. Hernia is not serious problem. If symptoms get worse go to sick line. Dr. John Vargo, April 30, 1992.

(emphasis in original). On the same day (April 24), plaintiff sent Superintendent Maass a memo noting plaintiff had been sent to OSP so he could obtain treatment, but the medical department was refusing to perform the operation. Plaintiff received a reply from Pat Lilienthal, Health Services Manager at OSP:

> You saw our surgeon, Dr. Strauss, on 10/7/91. He found you had a reducible hernia. The surgery to repair that hernia is elective. Health Services does not cover elective procedures. We cover *medically necessary* procedures. Pat Lilienthal, Health Services Manager. May 5, 1992.

(emphasis in original). On May 19, 1992, plaintiff went to the infirmary and complained that he had been waiting seven months for the operation. On May 26, 1992, plaintiff was examined by Dr. Vargo. Vargo's notes from that examination report he found a "small" left inguinal hernia that was "reducible." Vargo also noted plaintiff "had hernia when came to jail." Although in his memos to jail officials plaintiff had complained he was in some pain, Dr. Vargo prepared a report saying plaintiff was "essentially asymptomatic." The chart notes record that Vargo also told plaintiff the sur-

gery was "elective," but do not indicate whether Dr. Vargo defined that term for plaintiff.

On July 23, 1992, plaintiff returned to the infirmary once more, complaining of a "very sore hernia." The doctor (name illegible) noted a "slight bulging" in the left inguinal area, and tenderness on the left side. On July 30, 1992, plaintiff was again examined by Dr. Vargo, who reported finding "no adenopathy" and "no hernia." On September 25, 1992, plaintiff was reassigned to the general labor pool, meaning he could be assigned to any job in the prison, without any restrictions on lifting or other activities. Shortly thereafter, plaintiff filed this action. In the months that followed, plaintiff continued to request surgery, and prison officials repeatedly declined to furnish it.

On December 1, 1992, plaintiff sent a memo to Dr. Vargo requesting "a truss so I will no longer have to continue to push my intestines back into my abdomen." Plaintiff was told to report to the infirmary to discuss the matter. On December 18, 1992, plaintiff was examined by Dr. Degner, who told plaintiff to rest whenever the hernia bothers him, and to seek immediate medical care if there were any signs of strangulation of the hernia. Plaintiff was not given a truss, and no lifting restrictions were placed on his work assignments. Drs. Strauss and Vargo both testified that they would "never" recommend a truss for a patient because it is an ineffectual treatment that may result in further complications. Plaintiff offered no evidence to contradict that testimony, and I accept it as true.

On January 20, 1993, while this action was pending, G. Holland, Nurse Manager at OSP, exempted plaintiff from performing any job requiring him to lift over 20 pounds or engage in repetitive lifting. During pre-trial briefing, defendants insisted the directive was issued only to accommodate plaintiff's complaints and the restrictions were not medically necessary.

On June 9, 1993, plaintiff was examined by Dr. Peter Bernardo, a court appointed independent medical expert. Dr. Bernardo found plaintiff had a left inguinal hernia. He further advised the court that an injury of this sort not only presented a "well defined risk of incarceration with possible strangulation of the bowel" but was "itself painful and will limit activity." Dr. Bernardo recommended surgery. OSP officials disagreed with Dr. Bernardo's conclusions and recommendations, but decided to proceed with the operation "for strategic legal reasons." Surgery was performed by Dr. Strauss on July 9, 1993, and appears to have been successful in repairing the hernia and alleviating any pain.

■ Three factual questions merit special discussion. First, defendant contends plaintiff has not been injured by the delay in treatment. I disagree. Plaintiff may have suffered no long-term physical harm from the nearly two-year delay in providing the operation, but he did suffer some pain, anxiety, and restricted activity during that time. Plaintiff testified that when a loop of intestine poked through the abdominal wall, the pain was severe enough that he was compelled to sit or lay down and relax. The pain subsided once the hernia was reduced, but he "was always aware of it being there." Defendant questions plaintiff's description of the pain. Dr. Strauss testified that hernias can be quite painful while forming, but thereafter many patients have little or no discomfort. Dr. Strauss conceded that pain is a subjective complaint that varies between patients, but found no objective indications of tenderness when he examined plaintiff. However, Dr. Strauss only examined plaintiff on two occasions (October 7, 1991 and June, 1993). Notes from other medical exams do reflect findings of tenderness. Dr. Bernardo also noted that hernias may be painful.

In addition to pain, plaintiff described the anxiety he felt while pushing the protruding intestine back inside his abdominal cavity. Dr. Strauss testified that it was actually extraperitoneal fat, not intestine, that was protruding through the abdominal wall, but plaintiff did not know this at the time, and that ignorance no doubt contributed to his anxiety. Plaintiff also testified that he lost good time credits because pain from the hernia made it impossible for him to complete his vocational training program in the auto body shop. I find that on the whole plaintiff's testimony was credible, and that he was

injured by the lengthy delay in performing surgery.

The second issue is the proper treatment of a hernia. Dr. Bernardo advised the court that surgery is the proper treatment for this injury. Dr. Strauss agreed that it "is the standard surgical party line that all routine inguinal hernias like plaintiff's should be repaired by surgery." Dr. Vargo similarly acknowledged that surgical repair is the standard treatment for a moderate inguinal hernia in patients who are not in prison. Drs. Strauss and Vargo emphasized that in some patients the hernia results in little discomfort, and those patients choose to forego surgery. It does not follow, however, that *all* patients will have little discomfort, or choose to forego surgery. Nonetheless, inmates at OSP have no choice whether to accept or forego surgery, because Dr. Vargo has established a *de facto* policy that surgery is never authorized for a "routine, nonincarcerated, simple, small to moderate sized hernia," regardless of the inmate's subjective complaints. At trial, the defense offered three justifications for that policy. First, they argued that surgical repair posed a danger to the patient, but the only example offered was an instance in which the patient died because the bowel was stitched to the abdominal wall. Dr. Strauss conceded this was really a case of malpractice, and there is nothing inherently dangerous about the procedure.[1] Second, prison officials argued that strangulation occurs in only a relatively small percentage of cases. Finally, they argued that an inmate is never far from medical treatment, so notwithstanding that an acutely incarcerated hernia is a life-threatening condition, they are confident that the prison medical staff could recognize the danger and perform emergency surgery within the narrow window of time available before serious injury or death ensued. Even assuming that is true, and that the risks of emergency surgery are outweighed by the costs of performing prophylactic outpatient repair, that does not mean prison officials can simply ignore hernias. In some patients, an unincarcerated hernia will nonetheless cause pain and require the patient to restrict activity. Patients may also experience considerable anxiety from an unrepaired hernia. These symptoms, which affect inmate and non-inmate patients alike, may tip the scales towards surgical repair in specific cases.

In his post-trial brief, defendant contends he "cannot be expected to have divined that plaintiff's hernia was peculiar and caused him pain, if it did." Dr. Vargo need not have "divined" this knowledge. Dr. Vargo read and initialed the chart notes from Dr. Strauss's examination of plaintiff on October 7, 1991, which included Dr. Strauss's observation that plaintiff was complaining of "[q]uite a lot of activity related discomfort." Plaintiff also sent Dr. Vargo a memo complaining of continued pain. Dr. Vargo presumably reviewed plaintiff's medical chart before responding to this and other memos. The chart notes from July 23, 1992 also reflect that plaintiff was complaining of a "very sore hernia" and the examiner observed tenderness. Plaintiff was personally examined by Dr. Vargo just one week later. It is inconceivable that Dr. Vargo would not have reviewed plaintiff's medical chart in preparation for that examination, or have otherwise learned of plaintiff's complaint. Indeed, Dr. Vargo's notes from his July 30, 1992 examination are recorded on the same page, and directly underneath, the July 23 chart notes.

The third factual dispute concerns the "waiting list." Defendants repeatedly told plaintiff he was on the "waiting list" for elective surgery. Plaintiff understood this was a list of inmates who would receive surgery as funds became available. That understanding is consistent with both the ordinary meaning of the term and plaintiff's account of his October 7, 1992 discussion with Dr. Strauss.

Prison officials have offered varying accounts of this list. During pre-trial discovery, defendant Lilienthal categorically denied that there was a "waiting list." On the other hand, Dr. Strauss testified that it was merely

---

**1.** The use of this dubious argument suggests post-hoc efforts by defendants to justify a decision that was actually made for other reasons, and casts a shadow upon the other explanations offered by defendants.

a list of inmates with medical problems. Dr. Strauss also testified that he advised plaintiff that placement on the waiting list was not a guarantee that he would ever undergo surgery, and that this understanding was recorded in his chart notes for October 7, 1991. However, those notes do not substantiate this caveat. Rather, the chart notes simply state that plaintiff was "placed on the list for elective surgery pending approval by the Health Services Manager."

Dr. Vargo also advised plaintiff that he was on the waiting list for surgery, but would not be operated upon immediately because it was not an emergency. A reasonable inference was that other inmates with more urgent problems would be treated before plaintiff, but that plaintiff would eventually be treated. At trial, Dr. Vargo conceded that an inmate placed on the "waiting list" would never receive surgery, no matter how long he waited, unless the inmate's condition deteriorated to the point where immediate surgery was required. Under those circumstances, surgery would be performed anyhow, regardless of whether the inmate was on the waiting list. Similarly, if the inmate had sufficient funds to pay for the cost of the surgery, plus the guards and transportation to an outside hospital, then the surgery would be performed immediately and there would be no need to wait. In either case, the inmate derived absolutely no benefit from being on the "waiting list."

At trial, Dr. Vargo suggested the "waiting list" was really "a little bit of a misnomer," and that the term "waiting list" "just means that we are aware of" the inmate's problem. That may have been the practical effect of the list, but it does not explain the use of the term "waiting list." Plaintiff suggests the "waiting list" is really just a ruse OSP officials use to placate inmates by suggesting the inmate will eventually receive treatment when prison officials have no intention of

ever providing that treatment. The correspondence between plaintiff and Dr. Vargo lends some support to plaintiff's theory. Even if Dr. Vargo was initially unaware of plaintiff's understanding of the waiting list, plaintiff's April 24, 1992 memo to Dr. Vargo should have raised a red flag. Instead of dispelling that misunderstanding, Dr. Vargo simply reiterated, "you are on waiting list." [2]

Dr. Vargo testified that the inmates all know of the limited significance of the "waiting list," but "sometimes they hear what they would like to hear." Under the circumstances, I cannot fault the inmates for being confused.

## CONCLUSIONS OF LAW

1. *Qualified Immunity:*

  ▮▮▮ Defendant Vargo asserts he is qualifiedly immune from liability because there are no cases clearly establishing an inmate's constitutional right to surgical repair of an ordinary inguinal hernia. I disagree. A reasonable public official would have known that there are circumstances in which the Eighth Amendment requires prison officials to pay for "elective" surgery to repair a hernia, and that a categorical refusal to repair unincarcerated hernias violates the Eighth Amendment. *See Jones v. Johnson,* 781 F.2d 769 (9th Cir. (Or.) 1986); [3] *Johnson v. Clinton,* 763 F.2d 326, 328 (8th Cir.1985). In any event, defendant defines the issue too narrowly. The precise facts need not have been previously determined, so long as the legal principle is clearly established and a reasonable public official would realize that his conduct violated that rule of law. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). This case does not present any novel legal questions, or unusual facts. Nor is this a case of negligence or malpractice, where prison officials are accused of misdiagnosing the prisoner's

---

**2.** Dr. Vargo also stated, "Interpret it as not emergency.... It is elective." The term "elective" may have some special significance to health care professionals, but not to the average inmate. When coupled with the assurance "You are on waiting list," that statement is not calculated to put an inmate on notice that the prison has no intention of providing the operation.

**3.** I commend defense counsel for his honesty in calling this case to the court's attention after discovering that his opponent had failed to cite potentially controlling authority.

ills. Rather, the accusation here is that Dr. Vargo was fully aware of plaintiff's injury, knew plaintiff was suffering pain and anxiety as a result of that injury, knew an operation to repair the hernia would likely alleviate plaintiff's symptoms, and knew plaintiff had repeatedly requested such an operation, but nonetheless refused to provide appropriate medical treatment because Dr. Vargo had adopted a *de facto* policy of not paying for such operations in order to minimize the cost of medical care for prisoners. Plaintiff also alleges that OSP medical officials, including Dr. Vargo, misrepresented that plaintiff was on a waiting list for surgery when they knew that was false. No reasonable public official would believe this conduct was lawful.

■ I also reject defendant Vargo's contention that he is immune from liability because he was merely following standards established by the National Commission of Correctional Health Care or the prison system in some other state. The views of such bodies are worthy of consideration, but constitutional standards are not determined by the board of directors of a third party organization, or by a survey of policies followed in some other state. I therefore turn to the merits.

### 2. *Legal Standards:*

■ An inmate must rely on prison authorities to treat his medical needs. The government therefore has an obligation to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment. *Id.* at 104, 97 S.Ct. at 291. Mere negligence or malpractice does not. *Id.* at 105, 97 S.Ct. at 291–92. To state a cognizable Eighth Amendment claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Id.* at 106, 97 S.Ct. at 292. There are two components to such a claim. The objective element requires proof that the prisoner's serious medical needs were not timely and properly treated. If the claim alleges mere delay of surgery, the inmate must establish that the de-

lay resulted in some harm. *McGuckin v. Smith,* 974 F.2d 1050, 1060 (9th Cir.1992) (citing *Shapley v. Nevada Board of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)). The delay need not cause permanent injury. *Id. See also Hudson v. McMillian,* — U.S. —, —, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). Unnecessary infliction of pain is sufficient to satisfy this requirement. *Id.* The subjective element of an Eighth Amendment claim requires proof of unnecessary and wanton infliction of pain. *Wilson v. Seiter,* 501 U.S. 294, —, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991).

### 3. *Objective Element:*

■ Defendant contends this case involves a mere difference of medical opinion, and this court cannot question the professional judgment of a doctor. I ·disagree. While an honest difference of medical judgment would ordinarily not constitute deliberate indifference, *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989), a federal court is not required to blindly defer to the judgment of prison doctors or administrators in determining whether there has been deliberate indifference to an inmate's serious medical needs. *Hunt v. Dental Dept.,* 865 F.2d 198, 200 (9th Cir.1989) (citing *Wood v. Sunn,* 852 F.2d 1205, 1211 (9th Cir.1988), *vacated on other grounds,* 880 F.2d 1011 (1989)). Were the rule otherwise, the doctor's actions would be insulated from review. Moreover, the recommendations of the prison doctors were not based solely upon their professional medical opinions, but on legal and economic considerations as well. I accept the prison doctors' *medical* opinions that the injury was not imminently life-threatening, but a federal court need not defer to a prison doctor's *legal* opinion as to the extent of the state's duties under the Eighth Amendment.

■ Throughout most of this case, defendants asserted that the Eighth Amendment duty to provide medical care is limited to conditions that are life-threatening or will cause permanent disability. That is incorrect. The duty also applies to medical conditions that may result in pain and suffering which serve no legitimate penological pur-

pose. *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290. *See also McGuckin*, 974 F.2d at 1059 (delay in performing surgery resulted in needless infliction of pain); *Wood v. Housewright*, 900 F.2d 1332 (9th Cir.1990) (with two judges holding prisoner had stated an Eighth Amendment claim for pain inflicted by delay in treating injury, but dismissing the claim on other grounds); *Hunt*, 865 F.2d 198 (delay in providing prisoner with replacement dentures); *Jones*, 781 F.2d at 771–72 (hernia which results in pain, suffering, and the inability to perform a prison job is a serious medical need which prison doctors may not ignore); *Fields v. Gander*, 734 F.2d 1313 (8th Cir.1984) (inmate suffering severe pain from infected tooth).

An injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are indications that a prisoner has a "serious" need for medical treatment. *McGuckin*, 974 F.2d at 1059–60. Although defendant suggests plaintiff has exaggerated the degree of his pain, plaintiff clearly suffered some degree of needless pain, anxiety, and restricted body function during the two years his hernia went unrepaired.[4] A knife embedded in the chest may present a more immediate medical need, but prison officials may not systematically ignore more subtle conditions merely because those conditions are not imminently life-threatening.

▆▆▆▆ Defendant also asserts he had no legal duty to repair a "routine, nonincarcerated, simple, small to moderate sized hernia." That is an overstatement. The only Ninth Circuit case to address this question held that an inmate had stated a claim for deliberate indifference when he alleged that jail physicians, citing budgetary constraints, refused to perform surgery on his hernia unless it became incarcerated. *Jones*, 781 F.2d at 770–72. The inmate's complaints of pain and disability were sufficient to state a claim,

even though the hernia did not pose imminent danger of death or permanent disability. *Id. See also Clinton*, 763 F.2d at 328. That does not mean prison officials must provide surgery for every hernia, but merely that they must give due consideration to the unique facts of each case. This circuit's long experience with social security disability cases demonstrates that medical needs cannot be categorized as easily as defendant suggests, particularly when the inmate complains of pain. *See, e.g., Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir.1991) (en banc) (discussing procedures for evaluating complaints of pain, and recognizing that patient may suffer from pain and other disabilities that cannot be fully substantiated by objective medical findings). Prison officials may establish general guidelines, but the ultimate treatment decision must be made on a case-by-case basis, giving due consideration to the inmate's subjective complaints of pain and restricted activity, and also the inmate's psychological needs, where appropriate. Dr. Vargo erred in establishing a rigid rule that excluded consideration of the inmate's complaints of pain and incapacity, and made indifference a *de facto* policy.

▆▆▆ I also reject any suggestion that prison officials may avoid their duty to provide medical treatment by the simple expediency of labeling such treatment as "elective." The classification of surgery as elective does not abrogate the prison's duty, or power, to promptly provide necessary medical treatment for prisoners. *See Jones*, 781 F.2d at 770–71 (classification of hernia as "elective surgery" did not insulate county from Eighth Amendment duty to provide proper medical care); *Johnson v. Bowers*, 884 F.2d 1053, 1056 (8th Cir.1989) (prisoner waiting six years for elective arm surgery was entitled to relief) (citing *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 348 n. 32 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988)); *West v. Keve*, 541 F.Supp. 534 (D.Del.1982) (prison officials violated Eighth Amendment

---

4. Because I find that plaintiff suffered unnecessary pain and disability during the two-year delay in performing surgery, I do not address plaintiff's alternative argument that the risk or substantial potential of needless pain or injury is by itself sufficient to state an Eighth Amendment claim.

by not furnishing elective surgery for dysfunctional veins in leg that were causing varying degrees of pain); *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977) (elective treatment recommended by a physician but not "necessary" in a life or health saving sense, may still be constitutionally mandated if the prisoner elects to proceed with the treatment); *Derrickson v. Keve,* 390 F.Supp. 905, 907 (D.Del.1975) (prisoner serving life sentence suffered from severe headaches and constant congestion which could be cured by simple surgery that prison officials refused to provide on grounds it was "elective.") That is not to say that prison officials must provide breast augmentation surgery or tummy tucks. Society does not expect that prisoners will have unqualified access to health care. *Hudson,* —— U.S. at ——, 112 S.Ct. at 1000. Deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious. *Id.* Where surgery is elective, prison officials may properly consider the costs and benefits[5] of treatment in determining whether to authorize that surgery, but the words "elective surgery" are not a talisman insulating prison officials from the reach of the Eighth Amendment. Each case must be evaluated on its own merits.[6]

Lastly, I reject defendant's contention that repair of an inguinal hernia is not a serious medical need because that procedure is not ranked high on the list of medical procedures covered by the Oregon Health Plan legislation recently enacted by the Oregon legislature. While expressing no opinion on the validity or merits of that legislation, I take judicial notice that the Oregon Health Plan is not solely the product of objective scientific analysis but reflects political decisions made by elected officials after considering a variety of social, ethical, legal, political, economic, and medical factors. I also question whether the list was intended to serve as an objective ranking of the severity of medical problems. One of the highest ranked procedures is "vasectomy," which is unlikely to be a serious medical need for inmates in an all-male prison.

### 4. *Subjective Element:*

Plaintiff cannot recover damages unless defendant's actions were "wanton." The standard for wantonness is circumstantial. *Wilson,* 501 U.S. at ——, 111 S.Ct. at 2326. During a prison riot, prison officials must balance competing institutional concerns, such as the safety of staff and other prisoners, and they must often act hastily. Hence, the standard for wantonness is very high, requiring proof that the defendant acted maliciously and sadistically for the very purpose of causing harm. *Id.* In contrast, the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities, and frequently permits sufficient time for thorough deliberation. Therefore, deliberate indifference is sufficient to constitute wantonness. *Id.* Deliberate indifference requires, at a minimum, that the defendant thought about the matter (deliberated) and chose to ignore it. *Id.* 501 U.S. at ——, 111 S.Ct. at 2325. Deliberate indifference may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care. *McGuckin,* 974 F.2d at 1059 (citing *Hutchin-*

---

**5.** The cost-benefit ratio of a particular medical treatment is not always easy to calculate. For instance, plaintiff's trades include iron worker and auto mechanic, both of which require heavy lifting. Surgical repair of the hernia would likely have been a prerequisite to plaintiff's obtaining employment upon release from prison. Even assuming plaintiff obtained funds to pay for that surgery, he would still have needed several weeks or even months to fully recover from the operation, during which time he might have been unemployable in his present trades. Because the surgery was performed while he was in prison, plaintiff will now be fully recovered and ready to commence employment upon his release. Al-though the DOC may object to paying for the operation from its limited budget, performing the surgery while plaintiff was in prison will probably save the taxpayers money in the long run.

**6.** The length of the prison sentence is also a valid consideration. In some cases, prison officials may be justified in deferring "elective" treatment for an inmate serving a very brief sentence because the inmate will be able to obtain proper treatment following his release. Conversely, for an inmate serving a long sentence, a decision to defer surgery until after the inmate's release is really a decision to deny treatment.

*son v. United States,* 838 F.2d 390, 394 (9th Cir.1988)).

 The evidence establishes that Dr. Vargo was aware of plaintiff's medical problem, both directly and through his review of the chart notes from other physicians, and that Dr. Vargo made a deliberate decision to withhold surgery, even though medical professionals agree that surgical repair is the standard treatment for an inguinal hernia, surgery would not pose an unreasonable risk to the patient, and the operation would likely have alleviated plaintiff's symptoms. The evidence also establishes that Dr. Vargo's decision was significantly influenced by non-medical factors. Dr. Vargo's memos to plaintiff and log notes emphasized that the injury occurred before plaintiff was a resident of OSP. I question the significance of that fact. The location where an injury occurred is ordinarily relevant only in the context of legal liability, and has little relevance to the proper medical treatment for that injury.[7]

Dr. Vargo's explanation for the "waiting list" also leaves much to be desired. The name is misleading, and Dr. Vargo and other OSP medical officers did little to correct those misconceptions. The list could be viewed as a tool for mollifying inmates by leading them to believe their medical problems would eventually be addressed.

Although plaintiff repeatedly complained of pain, Dr. Vargo's notes reported that plaintiff was "essentially asymptomatic." Dr. Vargo also appears to have erroneously assumed that the Eighth Amendment requires treatment of only life-threatening conditions, and established a de facto policy that surgery for simple hernias is never appropriate for an indigent inmate, regardless of the degree of pain, anxiety, or incapacity.

I find Dr. Vargo was deliberately indifferent to plaintiff's complaints of pain and restricted capacity, and his obvious anxiety. Dr. Vargo's indifference resulted in the unnecessary infliction of pain, suffering, and anxiety upon plaintiff. Plaintiff has estab-

lished the necessary elements of his claim and is entitled to prevail.

**5. *Damages:***

Plaintiff is entitled to five thousand dollars compensatory damages for pain and other injuries described herein. I decline to impose punitive damages. I am confident that this decision, and the compensatory damages awarded, are more than adequate to vindicate the constitutional rights at issue and deter future violations.

### CONCLUSION

I find for plaintiff, and enter judgment for five thousand dollars compensatory damages.

---

**7.** Defendants are understandably concerned that they not become the medical provider of last resort for the thousands of Oregonians who lack health care insurance. However, no one has suggested that plaintiff committed a crime so he could be sent to prison and obtain medical treatment for his hernia. Nor was plaintiff seeking a liver transplant or other extraordinary care.